## UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE JOSEPH A. LAROSKI, JR., JUDGE

COALITION FOR FAIR TRADE IN
CERAMIC TILE,

      Plaintiff,

v.

UNITED STATES,

      Defendant,

and

WIN-TEL CERAMICS PRIVATE LTD.,
ANTIQA MINERALS, and
M.S. INTERNATIONAL, INC.

      Defendant-Intervenors.

<u>**PUBLIC VERSION**</u>

Court No. 25-00152

Business Proprietary
Information Identified by Single
Brackets [ ] and Removed from
Pages 4-6, 9, 11, 18, 20, 25-26,
31, 32-36.

**PLAINTIFF'S RULE 56.2 MOTION
<u>FOR JUDGMENT ON THE AGENCY RECORD</u>**

Plaintiff, the Coalition for Fair Trade in Ceramic Tile ("the Coalition" or "plaintiff"), respectfully submits this Rule 56.2 motion for judgment on the agency record challenging certain aspects of the Department of Commerce's ("Commerce") final determination in the countervailing duty investigation of ceramic tile from India. As demonstrated below, Commerce's final determination is unsupported by substantial evidence and otherwise not in accordance with law.

Plaintiff further moves that the Court remand this determination to Commerce for disposition consistent with the final opinion and order of the Court.

Respectfully submitted,

David M. Spooner, Esq.
Christine J. Sohar Henter, Esq.
Hendricks Valenzuela, Esq.

BARNES & THORNBURG LLP
555 12th Street, NW, Suite 1200
Washington, D.C. 20004
(202) 371-6377

*Counsel to Plaintiff*
*The Coalition for Fair Trade in Ceramic Tile*

## UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE JOSEPH A. LAROSKI, JR., JUDGE

COALITION FOR FAIR TRADE IN
CERAMIC TILE,

     Plaintiff,

v.

UNITED STATES,

     Defendant,

and

WIN-TEL CERAMICS PRIVATE LTD.,
ANTIQA MINERALS, and
M.S. INTERNATIONAL, INC.

     Defendant-Intervenors.

**PUBLIC VERSION**

Court No. 25-00152

Business Proprietary
Information Identified by Single
Brackets [ ] and Removed from
Pages 4-6, 9, 11, 18, 20, 25-26,
31, 32-36.

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
## 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

David M. Spooner, Esq.
Christine J. Sohar Henter, Esq.
Hendricks Valenzuela, Esq.

BARNES & THORNBURG LLP
555 12th Street, NW, Suite 1200
Washington, D.C. 20004
(202) 371-6377

*Counsel to Plaintiff*
*The Coalition for Fair Trade in Ceramic Tile*

**Dated**: March 10, 2026

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................. iii

I.    INTRODUCTION ................................................................................... 1

II.   STATEMENT PURSUANT TO RULE 56.2 ............................................ 1

      A.    Administrative Determination Under Review ....................................... 1

      B.    Statement Of The Issues ..................................................................... 2

III.  STATEMENT OF FACTS ....................................................................... 2

      A.    Respondents' Cross-Owned Affiliates ................................................. 3

      B.    Provision of Natural Gas by the SGOG for LTAR ................................ 6

      C.    Commerce's Preliminary Determination Understated Subsidies Received
            by the Mandatory Respondents ........................................................... 8

      D.    The Coalition's Upstream Subsidy Allegations .................................... 10

      E.    Commerce Rejected the Coalition's Arguments in its Final Determination ........ 10

IV.   SUMMARY OF ARGUMENT ................................................................. 12

V.    ARGUMENT .......................................................................................... 13

      A.    Standard Of Review ............................................................................ 13

      B.    Commerce's Cross-Ownership And Attribution Analysis Of The Antiqa
            Entity Is Unsupported By Substantial Evidence And Not In Accordance
            With Law .............................................................................................. 14

            1.    Legal Framework ...................................................................... 15

            2.    Commerce's Cross-Ownership and Attribution Analysis of Antiqa
                  Affiliates was Inconsistent with the Regulations and Unsupported
                  by Substantial Evidence ........................................................... 17

      C.    Commerce's Determination To Not Apply AFA To Win-Tel's Affiliate
            Reporting Was Unsupported By Substantial Evidence And Not In
            Accordance With Law ......................................................................... 27

            1.    Legal Framework ...................................................................... 28

            2.    Commerce's Failure to Apply AFA to Win-Tel's Affiliate
                  Reporting was Unlawful and Unsupported by Substantial Evidence ...... 29

D.    Commerce's Application of AFA to the SGOG's Provision of Gas for
        LTAR Program and Benchmark Calculation was Unlawful and
        Unsupported by Substantial Evidence ................................................................... 37

        1.    Legal Framework ........................................................................................ 38

        2.    Commerce's Application of AFA and Benchmark Calculation
               for the Gas for LTAR Program is Unlawful and Unsupported by
               Substantial Evidence .................................................................................. 39

E.    Commerce's Failure to Initiate on the Minerals for LTAR Upstream
        Allegation was Unlawful and Unsupported by Substantial Evidence .................. 43

VI.    CONCLUSION ................................................................................................................. 45

PUBLIC VERSION

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Ansaldo Componenti, S.p.A. v. United States*, 628 F. Supp. 198, 205 (Ct. Int'l
    Trade 1986) ..................................................................................................27, 36

*Aqua Prods., Inc. v. Matal*,
    872 F.3d 1290 (Fed. Cir. 2017)....................................................................14

*BMW of North America LLC v. U.S.*,
    926 F.3d 1291 (Fed. Cir. 2019)....................................................................38

*Consol. Edison Co. v. N.L.R.B.*,
    305 U.S. 197 (1938)......................................................................................13

*Decatur v. Paulding*,
    14 Pet. 497 (1840).........................................................................................14

*Essar Steel, Ltd. v. U.S.*,
    753 F.3d 1368 (Fed. Cir. 2014)....................................................................38

*Fabrique de Fer de Charleroi, SA v. U.S.*,
    25 C.I.T. 567 (2001) .....................................................................................36

*Fine Furniture (Shanghai) Ltd. v. United States*,
    748 F.3d 1365 (Fed. Cir. 2014)...............................................................38, 40

*Guangdong Wireking Housewares & Hardware Co., Ltd. v. U.S.*,
    900 F. Supp. 2d 1362 (Ct. Int'l Trade 2013) ..............................................15

*Gujarat Fluorochemicals Ltd. v. United States*,
    153 F.4ᵗʰ 1376 (Fed. Cir. 2025)...................................................................15

*Hung Vuong Corp. v. U.S.*,
    483 F. Supp. 3d 1321 (Ct. Int'l Trade 2020) ..............................................28

*Huvis Corp. v. U.S.*,
    525 F. Supp. 2d 1370 (Ct. Int'l Trade 2007) ..............................................13

*Kisor v. Wilkie*,
    588 U.S. 558 (2019)..................................................................................14, 25

*KYD, Inc. v. United States*,
    607 F.3d 760 (Fed. Cir. 2010)......................................................................38

*Loper Bright Enterprises v. Raimondo*,
    603 U.S. 369 (2024).................................................................................13, 14

*Nippon Steel Corp. v. U.S.*,
    337 F.3d 1373 (Fed. Cir. 2003)............................................................ *passim*

*Nucor Corp. v. U.S.*,
    600 F. Supp. 3d 1225 (Ct. Int'l Trade 2022) ..........................................43

*PAM, S.p.A. v. United States*,
    582 F.3d 1336 (Fed. Cir. 2009)...............................................................13

*Papierfarbik August Koehler SE v. U.S.*,
    843 F.3d 1373 (Fed. Cir. 2016)...............................................................28

*POSCO v. United States*,
    977 F.3d 1369 (Fed. Cir. 2020)....................................................18, 21, 44

*Rhone Poulenc, Inc. v. U.S.*,
    899 F.2d 1185 (Fed. Cir. 1990)...............................................................42

*RZBC Grp. Shareholding Co. v. U.S.*,
    100 F. Supp. 3d 1288 (Ct. Int'l Trade 2015) ..........................................43

*Skidmore v. Swift & Co.*,
    323 U.S. 134 (1944).................................................................................22

*Wind Tower Coal v. U.S.*,
    569 F.Supp.3d 1221 (Ct. Int'l Trade 2022) ............................................20

**Statutes and Regulations**

19 C.F.R. § 351.308(c)..................................................................................38

19 C.F.R. § 351.311(c)(2)..............................................................................31

19 C.F.R. § 351.511.................................................................................38, 40

19 C.F.R. § 351.511(a)(2)(i).........................................................................39

19 C.F.R. § 351.511(a)(2)(ii)........................................................................39

19 C.F.R. § 351.511(a)(2)(iii).......................................................................39

19 C.F.R. § 351.525......................................................................................15

19 C.F.R. § 351.525(b)(vi)............................................................................16

19 C.F.R. § 351.525(b)(6)(i).........................................................................15

19 C.F.R. § 351.525(b)(6)(ii)..............................................................................24

19 C.F.R. § 351.525(b)(6)(ii)-(v).............................................................19, 22, 24

19 C.F.R § 351.525(b)(6)(ii-vi) .........................................................................15

19 C.F.R. § 351.525(b)(6)(iv)..............................................................................24

19 C.F.R. § 351.525(c).....................................................................16, 20, 21, 32

19 U.S.C. § 1516a(b)(1)(B) ................................................................................13

19 U.S.C. § 1671(a) .............................................................................14, 15, 35

19 U.S.C. § 1671(e) ...........................................................................................43

19 U.S.C. § 1677(5)(E) .................................................................................38, 40

19 U.S.C. § 1677d.........................................................................................18, 44

19 U.S.C. § 1677e(a)........................................................................28, 30, 36, 37

19 U.S.C. § 1677e(a)-(b) ...................................................................................38

19 U.S.C. § 1677e(b)......................................................................28, 37, 38

19 U.S.C. § 1677f-1(e)(2) ..................................................................................32

**Other Authorities**

*Bottom Mount Combination Refrigerator-Freezers From the Republic of Korea: Final Affirmative Countervailing Duty Determination*, 77 Fed. Reg. 17410 (March 26, 2012) ................................................................................20

*Ceramic Tile from India: Countervailing Duty Order*, 90 Fed. Reg. 25,234 (Dep't of Commerce June 16, 2025) ("CVD Order") ....................................1, 12

*Ceramic Tile from India: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination, in Part*, 90 Fed. Reg. 17,036 (Dep't of Commerce April 23, 2025) ("Final Determination") .....................1, 12

*Ceramic Tile from India: Initiation of Countervailing Duty Investigation*, 89 Fed. Reg. 42,841 (Dep't of Commerce May 16, 2024) ("Initiation Notice")....................................2, 7

*Ceramic Tile from India: Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances Determination, in Part, and Alignment of Final Determination with the Final Antidumping Duty Determination*, 89 Fed. Reg. 79,245 (Dep't of Commerce Sept. 27, 2024) ("*Preliminary Determination*") ..................................................................3, 8

*Ceramic Tile from India: Preliminary Negative Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 89 Fed. Reg. 95,182 (Dep't of Commerce Dec. 2, 2024) .............................................................18

*Certain Lined Paper Products from Indonesia*, 71 Fed. Reg. 47,174 (Dep't of Commerce Aug. 16, 2006) .....................................................................................15

*Certain Quartz Surface Products from India: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances, in Part*, 85 Fed. Reg. 25,398 (Dep't of Commerce May 1, 2020) .................................................................................................................40

*Countervailing Duties; Final Rule*, 63 Fed. Reg. 65,348, 65,399 (Dep't of Commerce November 25, 1998) ("*1998 CVD Preamble*") .............................. *passim*

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2022*, 91 Fed. Reg. 3419 (Dep't of Commerce Jan. 27, 2026) .................................................................................................................35

*Final Affirmative Countervailing Duty Determination*, 83 Fed. Reg. 28,186 (Dep't of Commerce June 18, 2018) .........................................................................19

*Multilayered Wood Flooring From the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2013*, 81 Fed. Reg. 32,291 (Dep't of Commerce May 23, 2016) ...................................17

*Preliminary Affirmative Countervailing Duty Determination*, 84 Fed. Reg. 54, 838 (Dep't of Commerce December 13, 2019) ("*QSP from India CVD Prelim*") ............................................................................................................22

*Report of the House Committee on Ways and Means*, H.R. Rep. No. 98-725 (1984) .................................................................................................................44

S. Rep. No. 1221, 92d Cong., 2d Sess. 8 (1972) .......................................................15

*Uruguay Round Agreements Act*, Statement of Administrative Action, reprinted in 1994 U.S.C.A.A.N. 4040,4199 ......................................................................37

## I.    <u>INTRODUCTION</u>

On behalf of the Coalition for Fair Trade in Ceramic Tile ("the Coalition" or "plaintiff"), we respectfully submit the following brief in support of Plaintiff's motion for judgment on the agency record.  As we argue below, throughout the course of this proceeding, Commerce acted inconsistently with its statutory mandate to remedy the full extent of countervailable subsidies which benefitted the mandatory respondents and their suppliers.  In doing so, Commerce allowed respondents to dictate the course of this investigation and escape noncooperation without any adverse consequences that would deter future noncompliance.  As such, Commerce's final determination is unlawful and unsupported by substantial evidence.

## II.    <u>STATEMENT PURSUANT TO RULE 56.2</u>

### A.    Administrative Determination Under Review

The administrative determination under review is the final determination in the countervailing duty ("CVD") investigation of ceramic tiles from India, and subsequent CVD order. *See Ceramic Tile from India: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination, in Part*, 90 Fed. Reg. 17,036 (Dep't of Commerce April 23, 2025) ("Final Determination") (P.R. 735)[1], and accompanying Issues and Decision Memorandum ("IDM") (P.R. 729); *see also Ceramic Tile from India: Countervailing Duty Order*, 90 Fed. Reg. 25,234 (Dep't of Commerce June 16, 2025) ("CVD Order") (P.R. 748). The period of investigation ("POI") is April 1, 2023, through March 31, 2024.  *Id.*

---

[1] Citations to the public record (P.R.) and confidential record (C.R.) refer to the record of the countervailing duty investigation.

### B.    Statement Of The Issues

1.    Whether Commerce's cross-ownership and attribution analysis regarding Antiqa Minerals ("Antiqa") and its affiliates was unsupported by substantial evidence and not in accordance with law.

2.    Whether Commerce's refusal to apply adverse facts available ("AFA") to Win-Tel Ceramics Pvt. Ltd. ("Win-Tel") and its affiliates was unsupported by substantial evidence and not in accordance with law.

3.    Whether Commerce's application of AFA to the State of Gujarat's ("SGOG") provision of gas for less than adequate remuneration ("LTAR") program, its subsequent benchmark selection, and the resulting determination of no benefit was unsupported by substantial evidence and not in accordance with law.

4.    Whether Commerce's failure to initiate plaintiff's upstream subsidy allegation on minerals for LTAR was unsupported by substantial evidence and not in accordance with law.

## III.    STATEMENT OF FACTS

On April 19, 2024, the Coalition submitted a CVD petition regarding subsidized imports of ceramic tile from India.  See *Petition for Antidumping and Countervailing Duties on Imports of Ceramic Tile from India*; *Volume III: Countervailing Duty Allegations Against India*, (April 19, 2024) ("Petition Vol III: CVD Allegations") (P.R. 1-4).  Commerce subsequently initiated its CVD investigation covering ceramic tile from India.  See *Ceramic Tile from India: Initiation of Countervailing Duty Investigation*, 89 Fed. Reg. 42,841 (Dep't of Commerce May 16, 2024) ("Initiation Notice") (P.R. 324).

In its initiation notice, Commerce stated that it intended to select mandatory respondents based on U.S. Customs and Border Protection (CBP) data.  *See id.*, 89 Fed. Reg. at 42,844.

PUBLIC VERSION

Subsequently, Commerce selected Antiqa and Win-Tel, the two exporters or producers that accounted for the largest volume of subject merchandise, as mandatory respondents in this investigation.  *See* Commerce Memo, *Countervailing Duty Investigation of Ceramic Tile from India: Respondent Selection* (June 12, 2024) ("Respondent Selection Memo") (P.R. 372; C.R. 46). Commerce then issued its questionnaires to the Government of India ("GOI") with instructions to forward copies of the questionnaire to the respondent companies, Antiqa and Win-Tel.  *See Countervailing Duty Investigation of Ceramic Tile from India: Countervailing Duty Questionnaire*, (June 14, 2024) ("Initial Questionnaire") (P.R. 373); *see also Ceramic Tile from India: Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances Determination, in Part, and Alignment of Final Determination with the Final Antidumping Duty Determination*, 89 Fed. Reg. 79,245 (Dep't of Commerce Sept. 27, 2024) ("Preliminary Determination") (P.R. 646), and accompanying Preliminary Decision Memorandum, at 2 ("PDM") (P.R. 636).

### A.     Respondents' Cross-Owned Affiliates

Section III of Commerce's initial questionnaire requested, among other things, that Antiqa and Win-Tel submit complete questionnaire responses for (1) cross-owned affiliated companies, (2) export trading companies which export subject merchandise produced by the mandatory respondents, and (3) producers that supply the mandatory respondents with subject merchandise that is exported to the United States.  *See* Initial Questionnaire, at III-2 - III-3 (P.R. 373).  Antiqa and Win-Tel each submitted their respective responses to Commerce's affiliated companies portion of Section III of the initial questionnaire.  *See Antiqa Affiliation Response in the Countervailing Duty Investigation on Ceramic Tiles from India*, (July 12, 2024) ("Antiqa's Affiliation Response") (P.R. 397-403; C.R. 64-95); *Win-Tel, Theos, and Neelson Affiliation Response: Countervailing Duty Investigation on Ceramic Tile from India*, (July 8, 2024) ("Win-

Tel's Affiliation Response") (P.R. 394; C.R. 51-63). Commerce subsequently issued supplemental questionnaires to both mandatory respondents requesting additional information, including information regarding their affiliated companies, to which both respondents provided responses. *See* PDM at 2. Below, we discuss the facts as relevant to this appeal for each respondent's affiliated companies reporting.

### *Antiqa*

Antiqa reported having several cross-owned affiliates that produced or exported subject merchandise to the United States during the POI and average useful life (AUL) period. *See generally* Antiqa's Affiliation Response (P.R. 397; C.R. 64). Specifically, Antiqa, which is [      ] owned by the Kundariya family ("Antiqa Kundariya family"), explained it is not a producer of subject merchandise, but rather it is a producer of body clay, a raw material for ceramic tile, and that it is a trader/exporter of subject merchandise. *Id.* at 2, 12-13. Antiqa reported that it exported subject merchandise produced by two of its cross-owned affiliates – Antiek Vitrified LLP ("AVL") which is [     ] Antiqa Kundariya family owned, and Antiqa Ceramic Pvt. Ltd. ("ACPL") also [      ] Antiqa Kundariya family owned. *Id.* at 2, Exhibit 3 (C.R. 89). Both AVL and ACPL also directly exported subject merchandise to the United States. *Id.* 2-3. Antiqa further reported that it was cross-owned with Shivam Enterprise ("Shivam") – a [      ] Antiqa Kundariya family-owned trading company that exports subject merchandise to the United States that is produced by affiliate ACPL, and unaffiliated companies, including Luxgres Ceramica LLP ("Luxgres"). *Id.* at 2, 6-7, Exhibit 3; *see also* PDM at 13. Antiqa also reported that it is cross-owned with Antique Non Woven Pvt. Ltd. ("ANPL"), another [      ] Antiqa Kundariya family owned trading company which exports subject merchandise to the United States produced by

affiliate AVL, and an unaffiliated supplier, [                    ].  *See* Antiqa's Affiliation Response at 2, 8, Exhibit 3.

Antiqa identified several other companies in which the Antiqa Kundariya family has an ownership interest and which are involved in the sale or production of ceramic tile or inputs used in ceramic tile manufacturing.  *Id.* at 12-24.  As relevant here, Antiqa reported that the Antiqa Kundariya family through their Antique Granito Shareholders Trust ("AGST") holds [      ] of shares in Antique Marbonite P. Ltd. ("Marbonite"), a producer of ceramic tiles in India.  *See id*. at 13-18.  Antiqa additionally reported that the Antiqa Kundariya family, through the joint venture shareholder agreement, appoints [           ] directors on Marbonite's board, including Marbonite's [              ].  *See id.* at 16.  Finally, Antiqa also responded on behalf of Luxgres, an unaffiliated producer of subject merchandise because it supplied cross-owned trading company Shivam with ceramic tiles exported to the United States.  *See* PDM at 13; *see also* Antiqa's Affiliation Response at 6 and 9; *see also Luxgres Initial CVD Questionnaire Response in the Countervailing Duty Investigation of Ceramic Tiles from India*, (August 6, 2024) ("Luxgres Initial QR") (P.R. 486-490; C.R. 235-248).

### *Win-Tel*

In its initial affiliation response, Win-Tel also reported having numerous affiliated companies involved in the production and exportation of ceramic tile.  *See generally* Win-Tel's Affiliation Response (P.R. 394; C.R. 51).  Win-Tel, which is [       ] owned and controlled by the Kundariya family ("Win-Tel Kundariya family"), reported it is a producer and exporter of self-produced subject merchandise, and an exporter of subject merchandise produced by other affiliated and non-affiliated companies, *i.e.,* Win-Tel also acted as a trading company.  *Id.* at 2, 10, and Exhibit W-3.  Specifically, Win-Tel reported that it exported to the United States subject

merchandise produced by cross-owned affiliate Theos Tiles LLP ("Theos"), which is [     ] Win-Tel Kundariya family owned. *Id.* at 2, Exhibits W-3 and T-3. Win-Tel also reported that Win-Tel and Theos supplied subject merchandise to another cross-owned trading company which exported ceramic tile to the United States, Bhabha Exports, which is [     ] Win-Tel Kundariya family owned. *Id.* at 4-5, Exhibit W-3.[2] Even after acknowledging its affiliation and Bhabha Exports' participation as an exporter of subject merchandise, Win-Tel self-determined that it would not submit a response for Bhabha Exports. *Id.* at 5.

Additionally, Win-Tel reported that it also exported subject merchandise produced by Neelson Porselano LLP ("Neelson"), which it claimed is an unaffiliated producer. *Id.* at 3. However, in a footnote to Neelson's affiliation reporting, it acknowledged that during the AUL period, a Win-Tel Kundariya family member, [

                                    ] owned [      ] of Neelson. *See* Win-Tel's Affiliation Response, Neelson Affiliation Response at n. 1. Moreover, Neelson reported having affiliates involved in the production of ceramic tile, *i.e.,* Neelson Ceramic LLP ("Neelson Ceramic"), a producer of subject merchandise and inputs to subject merchandise that is [     ] cross-owned with Neelson. *See* Win-Tel's Affiliation Response, Neelson's Affiliation Response, at 4-5, Exhibit N-3.

**B.    Provision of Natural Gas by the SGOG for LTAR**

In its petition, the Coalition alleged numerous subsidies received by the ceramic tile industry in India including the provision of gas for LTAR by the Indian state of Gujarat. *See* Petition Vol. III: CVD Allegations, at 67-69 (P.R. 3).

---

[2] Notably, Win-Tel also inconsistently reported that "Bhabha Exports is only involved in trading of subject merchandise to third countries and it did not export any subject merchandise to the United States." *See* Win-Tel's Affiliation Response at 8; *see also infra* at 34-36.

The Coalition explained that India's ceramic tile industry was concentrated in the state of Gujarat. *Id.* Additionally, the petition explained that the ceramic tile industry in Gujarat relies heavily on Gujarat Gas, a state-owned gas supplier, for the provision of gas, a major input in ceramic tile production, at subsidized prices. *Id.* at 67-68. Publicly available sources from media and industry supported the allegations that state-owned entities provided gas subsidies to ceramic tile plants in Morbi, a city within the state of Gujarat, that resulted in lower gas prices in Morbi as compared to other regions in Gujarat. *See id.* at 68.

Given the evidence of subsidized gas prices available to the ceramic tile industry in Gujarat, the Coalition requested that Commerce investigate purchases of gas from state-owned providers in Gujarat during the POI. Accordingly, Commerce initiated on the gas for LTAR program, along with the many other subsidies alleged in the petition. *See* Initiation Notice, 89 Fed. Reg. 42,841. Subsequently, Commerce issued questionnaires to both mandatory respondents and the GOI requesting relevant information, including information regarding the provision of natural gas for LTAR. *See* Initial Questionnaire, at II-18 – II-20. However, the GOI failed to provide all requested information in response to Commerce's questions regarding the provision of gas for LTAR program. *See* PDM at 9.

Amongst the information requested by Commerce that the GOI failed to provide was information regarding the GOI's role and share in the natural gas market in India, and laws, plans or policies that address the pricing of natural gas. PDM at 9. Such information is relevant to Commerce's selection of an appropriate benchmark for determining whether state-owned entities provided natural gas for LTAR. *Id.* at 9-10. Because the GOI failed to cooperate to the best of its ability by not providing necessary information that was requested, Commerce determined to apply AFA against the GOI with respect to gas for LTAR program. *See id.*; *see also* IDM at Comment

4.  As a supposed adverse inference, Commerce adopted the presumption that India's domestic market for natural gas is distorted and thus, there were no viable tier one benchmarks for natural gas in India for purposes of measuring the benefit under this program.  PDM at 10.

Separately, both mandatory respondents submitted benchmark prices of natural gas for potential use as benchmarks.  *See Win-Tel's and Antiqa's Benchmark Submission*, (Aug. 26, 2024) (P.R. 528).  In their benchmark submission, respondents proposed world market prices for natural gas based on UN Comtrade data.  *Id.*  Additionally, the Coalition also submitted rebuttal benchmark comments highlighting deficiencies with respondents' proposed benchmark and providing alternatives for a more accurate benchmark for natural gas prices in India.  *See Petitioner's Rebuttal Factual Information to Win-Tel's and Antiqa's Benchmark Submission*, (Sept. 5, 2024) (P.R. 599).

### C.    Commerce's Preliminary Determination Understated Subsidies Received by the Mandatory Respondents

On September 27, 2024, Commerce published its affirmative preliminary determination in this countervailing duty investigation.  *See* Preliminary Determination, 89 Fed. Reg. 79,245. Although Commerce preliminarily determined that countervailable subsidies are being provided to producers and exporters of ceramic tile in India, Commerce failed to fully account for the benefits received by the mandatory respondents, their cross-owned affiliates, and respective suppliers of subject merchandise.

Commerce preliminarily calculated a 3.15 percent subsidy rate for Antiqa, a 3.05 percent subsidy rate for Win-Tel, and a 3.08 percent subsidy rate for "all others."  *Id.*, 89 Fed. Reg. at 79,246.  In doing so, Commerce only preliminarily countervailed four programs, and declined to countervail numerous other programs, including the SGOG's provision of gas for LTAR.  PDM at 19-27, 29-30.  Although Commerce preliminarily applied AFA against the GOI in the provision

of gas program, based on the benchmark used in the calculation, Commerce determined that the program did not provide a countervailable benefit. *See* PDM 9-10, 29-30. Additionally, Commerce failed to attribute subsidies reported on the record of this proceeding by cross-owned affiliates of the Antiqa entity and failed to fully investigate subsidies received by the Win-Tel entity.

As relevant to this appeal, although Antiqa reported receiving subsidies by its [      ] cross-owned trading company, Shivam, which exported subject merchandise to the United States during the POI, Commerce preliminarily determined not to attribute any subsidies received by Shivam during the POI. *See Antiqa Initial CVD Questionnaire Response*, at 15-16 (Aug. 5, 2024) ("Antiqa's IQR") (P.R. 457; C.R. 114); *see also* PDM at 13-14. Relatedly, Commerce also failed to attribute subsidies reported by Luxgres, a supplier of subject merchandise exported by Shivam. *See Luxgres Initial CVD Questionnaire Response*, at 7-8 (Aug. 6, 2024) ("Luxgres IQR") (P.R. 486; C.R. 237); *see also* PDM at 13-14. Further, Commerce failed to preliminarily make any substantive analysis regarding cross-ownership between the Antiqa entity and Marbonite. *See generally* PDM.

Regarding the Win-Tel entity, Commerce preliminarily limited its attribution of subsidies to Win-Tel, Theos, and Neelson. *See* PDM at 14-15; *see also Win-Tel, Theos, and Neelson Section III Response* (Aug. 5, 2024) ("Win-Tel's IQR") (P.R. 474; C.R. 180). However, Commerce failed to make any substantive cross-ownership analysis regarding Win-Tel's trading company affiliate, Bhabha Exports, nor did Commerce examine Neelson's claim of lack of affiliation against the facts on the record. *See generally* PDM. Moreover, Commerce failed to examine Neelson's failure to report information regarding its cross-owned affiliates involved in the production and sale of subject merchandise. *Id.*

### D.    The Coalition's Upstream Subsidy Allegations

On November 22, 2024, the Coalition filed three upstream subsidy allegations including an allegation for the provision of minerals for LTAR.  *See Countervailing Duty Investigation of Ceramic Tile from India: Upstream Subsidy Allegation* (Nov. 22, 2024) ("Coalition's Upstream Allegations") (P.R. 660; C.R. 449-454); *see also* IDM at 2.  On December 4, 2024, Win-Tel and Antiqa submitted joint rebuttal factual information challenging the Coalition's upstream subsidy allegations.  *See Comments on Upstream Subsidy Allegation* (Dec. 4, 2024) ("Respondent's Upstream Comments") (P.R. 665; C.R. 457).

Subsequently, Commerce issued an upstream subsidy allegation supplemental questionnaire to the Coalition requesting additional information regarding the upstream allegations.  *See Upstream Subsidy Allegations Supplemental Questions* (Dec. 20, 2024) (P.R. 678).  On January 2, 2025, the Coalition filed its response to Commerce's supplemental questionnaire.  *See Petitioner's Upstream Subsidy Allegations Supplemental Questionnaire Response* (Jan. 2, 2025) ("Upstream Supplemental Response") (P.R. 682-686; C.R. 531-537).  On February 11, 2025, Commerce issued a post-preliminary memo in which it declined to initiate on all three of the Coalition's upstream subsidy allegations.  *See* Commerce Memo, *New Subsidy Allegations of Upstream Subsidies* (Feb. 11, 2025) ("Post-Prelim Upstream Memo") (P.R. 691; C.R. 538).

### E.    Commerce Rejected the Coalition's Arguments in its Final Determination

Between December 5 and December 20, 2024, Commerce conducted its verification of the questionnaire responses submitted by the GOI, Antiqa, and Win-Tel.  *See* IDM at 3.  On February 25, 2025, the Coalition, the GOI, Win-Tel, and MS International, Inc. ("MSI", an importer of subject merchandise) submitted their respective administrative case briefs.  *Id.*  On March 10,

2025, the Coalition, Win-Tel and Antiqa submitted administrative rebuttal case briefs. *Id.* MSI also submitted a letter in lieu of a rebuttal brief on March 10, 2025. *Id.* The GOI submitted its rebuttal case brief on March 24, 2025. *Id.*

On April 23, 2025, Commerce published its final determination in this countervailing duty investigation. In it, Commerce rejected many of the arguments raised by the Coalition challenging several aspects of Commerce's preliminary subsidy analysis including: (a) whether Commerce properly investigated and attributed subsidies received by cross-owned affiliates of the mandatory respondents, Antiqa and Win-Tel; (b) whether Commerce's application of AFA to the GOI was properly reflected in its selection of the benchmark to measure benefits under the gas for LTAR program; (c) and whether Commerce erred by not initiating on the Coalition's upstream subsidies. *See generally Petitioner's Case Brief* (Feb. 25, 2025) (P.R. 704; C.R. 543).

Commerce disagreed that it needed to include Shivam, a [        ] cross-owned exporter of subject merchandise, in its cross-ownership and attribution analysis. PDM at 13-14; IDM at 17 and 32. As a result, Commerce also neglected to attribute subsidies reported by Luxgres. PDM at 14. Commerce also disagreed that Marbonite was a cross-owned affiliate of Antiqa. IDM at Comment 2B. Commerce further explained that it "did not perform a cross-ownership analysis between Antiqa and any other company because affiliation with the trading company is not relevant or required under the regulation." IDM at 17.

Commerce also disagreed with the Coalition that Win-Tel withheld or failed to report information regarding its cross-owned affiliates and suppliers, thereby determining that application of AFA against Win-Tel was unwarranted. IDM at 13-15. Moreover, Commerce made certain changes to the calculation of the benchmarks used for measuring benefits under the gas for LTAR program, but nonetheless continued to find that even when it applied AFA to the program

it does not confer a benefit to respondents. IDM at 11, 41-47. Finally, Commerce also disagreed that it should have initiated an inquiry into the Coalition's minerals for LTAR upstream allegation. IDM at 81-83.

In its final determination, Commerce calculated a 3.45 percent subsidy rate for Antiqa, a 3.06 subsidy rate for Win-Tel, and a 3.18 subsidy rate for "All Others." *See* Final Determination, 90 Fed. Reg. at 17,037. Subsequently, the Coalition timely alleged that Commerce made ministerial errors in calculating a natural gas benchmark for the SGOG's provision of gas for LTAR program. *See Analysis of Ministerial Error Allegation*, at 1 (May 14, 2025) ("Ministerial Error Memo") (P.R. 745). Antiqa and Win-Tel submitted joint rebuttal ministerial comments. *Id.* Here again, Commerce disagreed with the Coalition that it "committed an error, ministerial or otherwise" in calculating the natural gas benchmark. *Id.* at 3.

On June 16, 2025, Commerce published the CVD order on ceramic tile from India in which it maintained the subsidy rates calculated in the final determination. *See* CVD Order, 90 Fed. Reg. 25,234. The Coalition subsequently filed this action.

## IV.   SUMMARY OF ARGUMENT

Throughout this investigation, Commerce repeatedly failed to abide by its mandate to offset the full amount of benefits provided to the mandatory respondents. Commerce erred when it failed to conduct an accurate cross-ownership analysis of Antiqa and its cross-owned affiliates involved in the production and sale of subject merchandise. Moreover, Commerce failed to investigate and attribute subsidies received by these cross-owned affiliates that benefitted the manufacture, production, or export of ceramic tile imported into the United States. Additionally, Commerce allowed Win-Tel to manipulate the outcome of the investigation by permitting Win-Tel to unilaterally determine what information it reported regarding affiliates involved in the production and sale of subject merchandise, and worse, to obfuscate information relevant to Commerce's

affiliation and attribution analysis.  In doing so, Commerce failed to apply adverse facts available to Win-Tel even when the record warranted it.

Commerce's application of AFA to the GOI in this case for its failure to provide Commerce with information requested to determine a proper benchmark price allowed it to benefit from its own noncooperation and is contrary to statutory intent of the AFA provisions. Furthermore, Commerce's calculation of the gas benchmark was also unsupported by substantial evidence and not in accordance with its practice.  Lastly, Commerce erred when it determined not to initiate on the Coalition's upstream subsidy allegation regarding minerals for LTAR and ignored its duty to investigate the appearance of subsidies alleged during the investigation.

## V.    **ARGUMENT**

### A.    **Standard Of Review**

The Court shall hold unlawful any determination, finding, or conclusion by Commerce that is unsupported by substantial evidence on the record, or otherwise not in accordance with law.  19 U.S.C. § 1516a(b)(1)(B).  Substantial evidence requires "more than a mere scintilla" of evidence or "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).  To determine if substantial evidence exists, the Court must review the record as a whole, including evidence that fairly detracts from the substantiality of the evidence.  *See Nippon Steel Corp. v. U.S.*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) ("*Nippon Steel*").

To be in accordance with law, Commerce's determination must be constitutional, and not contrary to statute, regulation, precedent, or procedures.  *See Huvis Corp. v. U.S.*, 525 F. Supp. 2d 1370, 1374 (Ct. Int'l Trade 2007).  Importantly, in reviewing whether Commerce's actions are not in accordance with law the Supreme Court recently made clear in *Loper Bright Enterprises v.*

*Raimondo* that "when the meaning of a statute {is} at issue, the judicial role {is} to 'interpret the act of Congress, in order to ascertain the rights of the parties.'" 603 U.S. 369, 385 (2024) (quoting *Decatur v. Paulding*, 14 Pet. 497, 515 (1840)).  In overturning *Chevron* deference, the Court explained that "courts interpret statutes, no matter the context, based on the traditional tools of statutory construction," to determine the "best reading of the statute." *See Loper Bright*, 603 U.S. at 400-403.

Similarly, the Court must exercise independent judgment when determining whether Commerce's interpretation and application of its own regulations is in accordance with law.  In fact, the Court uses the same interpretive rules to construe regulations as it does statutes; it considers the plain language of the regulation, the common meaning of the terms, and the text of the regulation both as a whole and in the context of its surrounding sections. *See Aqua Prods., Inc. v. Matal*, 872 F.3d 1290, 1316 (Fed. Cir. 2017).  Only if a regulation is "genuinely ambiguous" will the Court afford deference to an agency interpretation that is reasonable, represents an agency's authoritative or official position, implicates its substantive expertise, and reflects fair and considered judgment by the agency. *See Kisor v. Wilkie*, 588 U.S. 558, 573-79 (2019).  Still, "some interpretive issues may fall more naturally into a judge's bailiwick." *Id.* at 579.

### B.    Commerce's Cross-Ownership And Attribution Analysis Of The Antiqa Entity Is Unsupported By Substantial Evidence And Not In Accordance With Law

As demonstrated below, Commerce erred when it failed to conduct an accurate cross-ownership analysis of Antiqa and its cross-owned affiliates involved in the production and sale of subject merchandise.  Moreover, Commerce failed to investigate and attribute subsidies received "with respect to the manufacture, production, or export" of ceramic tile "imported, or sold (or likely to be sold) for importation, into the United States." 19 U.S.C. § 1671(a).  In doing so, Commerce failed to conduct this investigation in a way that would have accurately determined

subsidy rates that reflect the full extent of countervailable subsidies that benefited the production and export of ceramic tile from India. Accordingly, the Court should remand this matter for Commerce to accurately assess cross-ownership amongst Antiqa's affiliates involved in the production and sale of subject merchandise, and to investigate and attribute countervailable subsidies received by such cross-owned affiliates.

### 1. Legal Framework

The "specific purpose of the CVD law is to 'offset' the harmful effects of foreign subsidies." *Guangdong Wireking Housewares & Hardware Co., Ltd. v. U.S.*, 900 F. Supp. 2d 1362, 1370 (Ct. Int'l Trade 2013) (*citing* S. Rep. No. 1221, 92d Cong., 2d Sess. 8 (1972)). As such, Commerce has a duty to investigate countervailable subsidies provided "with respect to the manufacture, production, or export of a class or kind of merchandise imported, or sold (or likely to be sold) for importation, into the United States." 19 U.S.C. § 1671(a). To fulfill this mandate, Commerce drafted regulations that deal with the calculation of the *ad valorem* subsidy rate and the attribution of a subsidy to a particular product. *See* 19 C.F.R. § 351.525; *see also Countervailing Duties; Final Rule*, 63 Fed. Reg. 65,348, 65,399 (Dep't of Commerce November 25, 1998) ("*1998 CVD Preamble*").

Commerce's regulations provide "general rules" of attribution that the agency will apply to a given case. *See 1998 CVD Preamble*, 63 Fed. Reg. at 65,339. Generally, Commerce "normally will attribute a subsidy to the products produced by the corporation that received the subsidy." 19 C.F.R. § 351.525(b)(6)(i). However, Commerce also attributes subsidies to a company other than the company producing the subsidized product when "cross-ownership" exists. *See e.g., Gujarat Fluorochemicals Ltd. v. United States*, 153 F.4th 1376, 1378 (Fed. Cir. 2025); *see also* 19 C.F.R § 351.525(b)(6)(ii-vi). This is consistent with the principle that Commerce treats responding cross-owned companies as a single entity. *See e.g., Certain Lined*

*Paper Products from Indonesia*, 71 Fed. Reg. 47,174 (Dep't of Commerce Aug. 16, 2006), and accompanying IDM at 26.

The regulations define cross-ownership as:

> exist{ing} between two or more corporations when one corporation can use or direct the individual assets of the other corporation(s) in essentially the same ways it can use its own assets. Normally, this standard will be met when there is a majority voting ownership interest between two corporations or through common ownership of two (or more) corporations.

19 C.F.R. § 351.525(b)(6)(vi). The *1998 CVD Preamble* further clarifies that cross-ownership does not require one corporation to own 100 percent of the other corporation. Although, normally, cross-ownership exists when there is a majority ownership between two corporations, in certain circumstances, a large minority voting interest, such as 40 percent or a "golden share" may also result in cross-ownership. *See 1998 CVD Preamble*, 63 Fed. Reg at 65,401. Additionally, Commerce also cumulates benefits provided to a trading company which exports subject merchandise with benefits from subsidies provided to the firm which is producing subject merchandise that is sold through the trading company, regardless of whether the trading company and the producing firm are affiliated. 19 C.F.R. § 351.525(c).

When it implemented these rules, Commerce foresaw that "depending on the facts, several of the different rules may come into play at the same time." *See 1998 CVD Preamble*, 63 Fed. Reg. at 65,339. Additionally, because these are "general rules," Commerce also recognized "that there may be many scenarios where these attribution rules do not fit precisely the facts of a particular case." *Id.* at 65,400. However, Commerce emphasized that it was "extremely sensitive to potential circumvention of the countervailing duty law," and therefore intended to examine claims closely to "ensure that the attribution rules are not manipulated to reduce countervailing duties." *Id.*

2.    **Commerce's Cross-Ownership and Attribution Analysis of Antiqa
Affiliates was Inconsistent with the Regulations and Unsupported by
Substantial Evidence**

In a CVD investigation, a finding of cross-ownership is the mechanism that enables

Commerce to attribute to the respondent subsidies granted to another company, *i.e.*, the cross-

owned affiliate. *See e.g., Multilayered Wood Flooring From the People's Republic of China:

Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2013*, 81 Fed.

Reg. 32,291 (Dep't of Commerce May 23, 2016), and accompanying IDM at 8.  As such,

Commerce must first determine whether an affiliate is cross-owned before determining whether it

is appropriate to attribute subsidies received by said affiliate to the mandatory respondent.  Here,

Commerce switched the analysis and erroneously "did not perform a cross-ownership analysis

between Antiqa and any other company because affiliation with the trading company is not

relevant or required under the regulation." *See* IDM at 17.  By doing so, Commerce created an

enormous loophole by which Antiqa was able to manipulate the attribution rules to reduce

countervailing duties and circumvent the CVD law. *Contra 1998 CVD Preamble*, 63 Fed. Reg. at

65,400.  As a result, Commerce failed to accurately offset the injury caused by subsidies received

by Antiqa and its cross-owned affiliates involved in the production and sale of subject

merchandise.

### *Shivam*

In its responses to Commerce's questionnaires, Antiqa acknowledged that Shivam was a

cross-owned affiliate that directly exported subject merchandise to the United States. *See e.g.,*

Antiqa's Affiliation Response at 3.  So clear was Shivam's cross-ownership and relevance to the

investigation that Antiqa even submitted a full CVD questionnaire indicating that Shivam received

subsidies provided by the GOI during the POI. *See* Antiqa's IQR at 15-16.  Because Shivam acts

as a trading company, Antiqa also submitted a full CVD questionnaire on behalf of Luxgres, an

unaffiliated producer which supplied Shivam with subject merchandise, in which it too reported receiving subsidies during the POI. *See* Luxgres IQR at 7-8. However, rather than investigating and attributing subsidies reported within Antiqa's own questionnaire responses, Commerce abandoned its affirmative duty to investigate any appearance of subsidies related to the investigation that are discovered during an investigation. *See POSCO v. United States*, 977 F.3d 1369, 1378 (Fed. Cir. 2020) ("*POSCO*") ("Commerce has an affirmative duty to investigate any appearance of subsidies related to the investigation that are discovered during an investigation") (*citing* 19 U.S.C. § 1677d).

It is undeniable that Shivam and Antiqa are cross-owned affiliates involved in the exportation of subject merchandise to the United States. Shivam is [      ] cross-owned by the same Kundariya family that controls Antiqa. *See* Antiqa Affiliation Response at Exhibit 3; *see also Antiqa First Supplemental Response*, at Exhibit 3 (Aug. 5, 2024) ("Antiqa's 1SQR") (P.R. 470; C.R. 178-179). Commerce even acknowledged in its preliminary determination that "Antiqa, AVL, ACPL, ANPL *and Shivam* share common ownership because members of one family hold substantial ownership interests and board of director positions in the five companies," and that "{t}hese ownership interests and family relationship indicate that the companies' interests have merged, as contemplated by the *CVD Preamble*." PDM at 13 (emphasis added). In fact, so intertwined are the two companies that Commerce included Shivam in the Antiqa entity in the companion AD investigation covering the same POI. *See Ceramic Tile from India: Preliminary Negative Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 89 Fed. Reg. 95,182 (Dep't of Commerce Dec. 2, 2024) and accompanying PDM, at 5 ("based on the evidence on the record in this investigation, we preliminary find that Antiqa, an exporter of subject merchandise and a mandatory respondent in this investigation, is affiliated

with {ACPL}, {Shivam}, {AVL}, and {ANPL}, and should be treated as a single entity") (*unchanged* in AD Final Determination). However, here, Commerce incorrectly excluded Shivam from its cross-ownership analysis finding instead that only AVL, ACPL, and ANPL are cross-owned with Antiqa. PDM at 13-14, *see also* IDM at 17, 32.

Commerce's reasoning for doing so was inconsistent and unlawful. Commerce reasoned that Shivam does not satisfy any of the attribution criteria in 19 C.F.R. § 351.525(b)(6)(ii)-(v), and thus, it need not include this affiliate in its analysis. PDM at 14; IDM at 32. This justification is wrong for three reasons. First, as previously stated, a finding of cross-ownership is the mechanism that enables Commerce to attribute to the respondent subsidies granted to another company, not the other way around. By first requiring an exact fit with one of the attribution rules, Commerce ignored the necessary sequence of tasks and disregarded the fact that cross-ownership exists between Antiqa and Shivam – the true threshold for attribution to be considered. *See 1998 CVD Preamble*, 63 Fed. Reg. at 65,402 ("we do not intend to investigate subsidies to affiliated parties unless cross-ownership exists").

Second, Commerce itself has emphasized that the attribution regulations are "general rules of attribution" that do not "account for all possible permutations in advance." *1998 CVD Preamble*, 63 Fed. Reg. at 65,399. As such, the regulations are illustrative, and not an exhaustive list of all situations in which it is appropriate to attribute subsidies. Again, Commerce recognized "that there may be many scenarios where these attribution rules do not fit precisely the facts of a particular case." *Id.* at 65,400; *see also e.g., Ripe Olives from Spain: Final Affirmative Countervailing Duty Determination*, 83 Fed. Reg. 28,186 (Dep't of Commerce June 18, 2018) and accompanying IDM at 43 ("The *Preamble* also makes clear that our attribution rules do not account for all situations that may arise, because if Commerce tried to account for all possible permutations,

the result would be an extremely lengthy set of rules that could prove unduly rigid"); *see also Wind Tower Coal v. U.S.*, 569 F.Supp.3d 1221, 1242 (Ct. Int'l Trade 2022) (sustaining Commerce's attribution of subsidies received by tollers even though the CVD rules do not address tolling arrangements). As such, Commerce has in the past attributed subsidies received by trading companies, which do not squarely fit the attribution regulations, but nonetheless are cross-owned companies involved in the production or sale of subject merchandise. *See Bottom Mount Combination Refrigerator-Freezers From the Republic of Korea: Final Affirmative Countervailing Duty Determination*, 77 Fed. Reg. 17410 (March 26, 2012), and accompanying IDM at 2, 91-93 ("Bottom Mount Combination Refrigerator-Freezers"). In *Bottom Mount Combination Refrigerator-Freezers*, Commerce explained that "if subsidies received by operational companies that provide services that benefit the production and/or sale of the subject merchandise are not attributable to related companies producing goods, such service providers could be subsidized with impunity by governments, allowing producers to benefit." *Id.* Similarly, by not including Shivam in its cross-ownership and attribution analysis, Commerce here created a loophole by which subsidies provided to the cross-owned exporter of the subject merchandise were able to circumvent the CVD law.

Third, even if applicability of an attribution regulation is required, which as explained above it is not, Commerce disregarded the application of the trading company regulation which allows cumulation of benefits from subsidies provided to the trading company with benefits from subsidies provided to the producing firms. *See* 19 C.F.R. § 351.525(c). Thus, benefits received by Shivam, a trading company, could have been cumulated with the benefits reported and attributed to [                                                    ] which supplied Shivam with subject merchandise, which it later exported to the United States. *See*

Antiqa's Affiliation Response at 3 and Exhibit 1(c). By excluding Shivam, Commerce was also internally inconsistent within this investigation because Commerce included ANPL in its cross-ownership and attribution analysis even though it too was a trading company with no manufacturing facilities. *See* PDM at 14.

Relatedly, by failing to incorporate Shivam in its cross-ownership and attribution analysis, Commerce also failed to include Luxgres, a producer of subject merchandise that also supplied Shivam, which provided a full CVD questionnaire response in which it too reported receiving benefits from countervailable subsidies. PDM 13-14. Instead, benefits received by Luxgres should have also been cumulated with benefits provided to Shivam. *See* 19 C.F.R. § 351.525(c). Importantly, the record before Commerce already contains questionnaire responses from Luxgres which demonstrate that it received countervailable subsidies which benefited subject merchandise exported by Shivam, a cross-owned trading company controlled by the Antiqa Kundariya family. *See* Luxgres Initial QR; *compare POSCO*, 977 F.3d at 1378 ("Commerce has an affirmative duty to investigate any appearance of subsidies related to the investigation that are discovered during an investigation.…Commerce failed to investigate an appearance of a potential subsidy that was disclosed during the investigation within the Korean government's own questionnaire responses").

By failing to investigate and attribute the subsidies reported on the record by Shivam and Luxgres, Commerce undervalued the amount of benefit provided to the Antiqa entity. As such, the Court should remand this case for Commerce to properly include Shivam in its cross-ownership analysis and further instruct Commerce to investigate subsidies provided to suppliers of Shivam, including Luxgres.

### *Marbonite*

Commerce also erred when it determined that Marbonite is not cross-owned with Antiqa. Commerce's reasoning for its determination that cross-ownership does not exist between the two affiliates include: 1) disregard for prior determinations of cross-ownership between Antiqa entities and Marbonite in *QSP from India CVD* as misplaced; 2) because the attribution rules in 19 C.F.R. § 351.525(b)(6)(ii)-(v) do not apply to Marbonite and Antiqa for attribution purposes; and 3) because the record facts do not support a finding that "the Antiqa Kundariya family that has 50 percent shareholding in Marbonite can use or direct the individual assets of Marbonite in the same way it can use AVL, ACPL, or ANPL's (*i.e.*, the Antiqa Respondents other than Antiqa) assets." *See* IDM at 20-22. Below, we address why each reason is unsupported by the law and the record.

First, Commerce was too quick to dismiss the relevance of its prior determination in *QSP from India*. IDM at 20; *see also Certain Quartz Surface Products from India: Preliminary Affirmative Countervailing Duty Determination*, 84 Fed. Reg. 54, 838 (Dep't of Commerce December 13, 2019) ("*QSP from India CVD Prelim*") and accompanying PDM at 10. Indeed, consistency with earlier determinations provide Commerce's subsequent determinations with the "power to persuade." *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). Moreover, we disagree that facts warrant a different outcome.

In *QSP from India CVD*, Commerce explained:

> Antique Marbonite is a producer and exporter of quartz surface products. Antique Marbonite is a private limited company incorporated in India and a 50%-50% joint venture between Antique Trust and Prism Johnson. Antique Trust is an investment trust, which holds interest only in Antique Marbonite and does not carry out any business activities....The subject merchandise produced by Antique Marbonite is also exported to the United States through Shivam, which is cross-owned with Antique Marbonite. During the POI, Shivam also supplied to Antique Marbonite raw materials used for the production of subject merchandise. We preliminarily

> determine that Antique Marbonite, Prism Johnson, Shivam, and
> Antique Trust are cross-owned companies under common control,
> within the meaning of 19 CFR 351.525(b)(6)(vi).

*See QSP from India CVD* PDM at 10.

Similarly, the record of this investigation shows that Antique Marbonite is a producer of subject merchandise and is 50 percent owned by the Antiqa Kundariya family through the Antique Granito Shareholders Trust. IDM at 22; *see also* Antiqa Affiliation Response at 13. While, here, Commerce dismisses the relevance of the Antiqa Kundariya family's ownership in Marbonite, such ownership is directly relevant for a finding of cross-ownership. *See* IDM at 20 ("the petitioner notes only that the same Kundariya family that co-owns Marbonite is the same family that controls Antiqa"); *but see 1998 CVD Preamble*, 63 Fed. Reg. at 65,401 ("cross-ownership does not require one corporation to own 100 percent of the other corporation…in certain circumstances a large minority voting interest (for example, 40 percent) or a 'golden share' may also result in cross-ownership"). The 50 percent ownership by the Antiqa Kundariya family in Marbonite is directly probative of its cross-ownership with Antiqa. Moreover, as argued above and Antiqa acknowledges in its reporting, this investigation also demonstrates that Shivam is a cross-owned affiliate involved in the exportation of subject merchandise. *See supra* at 17-21. Therefore, the facts in *QSP from India CVD* are analogous regarding cross-ownership of Marbonite with Antiqa such that they provide persuasive value to the question of cross-ownership between Antiqa and Marbonite in this investigation.[3]

Next, Commerce again mistakenly required direct applicability with one of the attribution rules in 19 C.F.R. § 351.525(b)(6)(ii)-(v) for cross-ownership to occur. As explained above, this

---

[3] Additionally, as we explain later, Commerce relies on "past practice" in *QSP from India CVD* for its selection of a gas benchmark. Yet, here, it refuses to apply any weight to its prior cross-ownership determination in the same case. Such inconsistent reliance on the same case is arbitrary and capricious.

notion is inconsistent with the language and intent of the regulations and Commerce's prior policy pronouncements that the attribution regulations are not intended to be an all-encompassing or exhaustive list of possible attribution scenarios.  *See e.g., 1998 CVD Preamble*, 63 Fed. Reg. at 65,399.  Commerce is also mistaken when it found that "in this investigation, we similarly find that the rules in 19 C.F.R. § 351.525(b)(6)(ii)-(v) do not apply to Marbonite and Antiqa for attribution purposes."  IDM at 21.

The Antiqa entity in this case includes: Antiqa, an input supplier and trader; AVL, a producer of subject merchandise; ACPL, another producer of subject merchandise; and ANPL, another trading company.  *See* PDM at 13-14; *see also* Antiqa's Affiliation Response at 2-12.  As such, 19 C.F.R. § 351.525(b)(6)(ii)[4] is plainly applicable among Marbonite, AVL, and ACPL – as all three are cross-owned producers of the subject merchandise.    Similarly, 19 C.F.R. § 351.525(b)(6)(iv)[5] is also applicable between Antiqa and Marbonite given that Antiqa is also a producer of inputs dedicated to the production of subject merchandise and whose subsidies could have certainly been cumulated with those provided to a cross-owned producer of downstream subject merchandise such as Marbonite.  Therefore, although we do not argue that an exact match to the attribution rules is necessary, such a match is present in this investigation between the Antiqa entity and Marbonite.  As such, Commerce's reasoning for not finding cross-ownership between

---

[4] 19 C.F.R. § 351.525(b)(6)(ii) addresses attribution when there is cross-ownership between "corporations producing the same product" and states: "If two (or more) corporations with cross-ownership produce the subject merchandise, the Secretary will attribute the subsidies received by either or both corporations to the products produced by both corporations."

[5] 19 C.F.R. § 351.525(b)(6)(iv) addresses attribution when there is cross-ownership between an "input supplier" and a downstream producer and states: "If there is cross-ownership between an input supplier and a downstream producer, and production of the input product is primarily dedicated to production of the downstream product, the Secretary will attribute subsidies received by the input producer to the combined sales of the input and downstream products produced by both corporations (excluding the sales between the two corporations)."

Antiqa and Marbonite due to the lack of a match with the attribution rules is inconsistent with the intent and plain language of the regulations. *See Kisor*, 588 U.S. at 575 ("a court must carefully consider the text, structure, history, and purpose of a regulation, in all the ways it would if it had not agency to fall back on").

Finally, we address Commerce's conclusion that the facts undermine a finding that the Antiqa Kundariya family, a family that has a 50 percent shareholding in Marbonite, cannot use or direct the individual assets of Marbonite in the same way that it can use the assets of the Antiqa entity. IDM at 22. To begin, this erroneous conclusion disregards the fact that the Antiqa Kundariya family owns more than the 40 percent, or large minority voting interest, contemplated by Commerce in the *1998 CVD Preamble* for a finding of cross-ownership. *See 1998 CVD Preamble*, 63 Fed. Reg. at 65,401. As noted earlier, the same 50 percent ownership between the Antiqa Kundariya family and Marbonite was sufficient to warrant cross-ownership between Marbonite, the AGST, and Shivam – a [        ] Antiqa Kundariya owned trading company we argue should have also been part of the Antiqa entity in this case. *Compare QSP from India CVD* PDM at 10 *with* Antiqa's Affiliation Response at 2-9, 13-18; *see also* IDM at 22.

Moreover, in determining that Marbonite was not cross-owned with the Antiqa entity, Commerce confusingly highlighted the fact that no Antiqa Kundariya family members are shareholders in Prism Johnson and that there are no common managers or directors between Prism Johnon and any of the companies controlled by the Antiqa Kundariya family. *See* IDM at 21. However, this is red herring because common shareholders and management with Prism Johnson does not determine whether or not Marbonite is cross-owned with Antiqa. Rather, a proper inquiry would have considered the share of ownership interest and control of management between Marbonite and Antiqa. To this end, Commerce neglected evidence that fairly detracts from its

determination that Marbonite and Antiqa are not cross-owned, including that the Antiqa Kundariya family appoints [    ] of the directors on Marbonite's board, including Marbonite's [

] *See* Antiqa's Affiliation Response at 16; *cf. e.g., Nippon Steel*, 337 F.3d at 1379 ("to determine if substantial evidence exists, we review the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence'") (internal citation omitted).

Additionally, Commerce relied on evidence that Marbonite and Prism Johnson have an exclusive supply agreement through which Prism Johnson allegedly controls Marbonite's production and sales. IDM at 21. However, as Commerce itself verified, Marbonite may sell its merchandise independently, if written notice is provided. *See* IDM at 22; *see also Verification of the Questionnaire Responses of Antiqa Mineral*, at 5 (Feb. 11, 2025) ("Antiqa's Verification Report") (P.R. 692; C.R. 539). Furthermore, it is clear from the exclusive supply agreement itself that the Antiqa Kundariya family has control over Marbonite. Specifically, every page of the supply agreement between Prism Johnson and Marbonite [

] the supply agreement as the [                                    ] – Antique Granito Limited, the prior name of Marbonite. *See* Antiqa's Affiliation Response at 13-16 and Exhibit 3(b). Not to mention, that [                                    ] in the supply agreement, is also a shareholder in the Antiqa entity and a member of the Antiqa Kundariya family. *See* Antiqa's Affiliation Response at Exhibits 3 and 3(b).

Given that it was [                    ], a member of Antiqa Kundariya family, who [                                    ] Marbonite to the terms of the supply agreement with Prism Johnson, it stands to reason that the Antiqa Kundariya family can, in fact, use or direct the assets

of Marbonite in essentially the same way it can use its own assets.  As such, the Court should remand this case for Commerce to reconsider its determination regarding Marbonite's cross-ownership with the Antiqa entity.

In sum, Commerce ignored, with regard to Shivam, and lacked, with regard to Marbonite, information necessary to examine the complete scope of subsidies provided to Antiqa and its cross-owned affiliates/trading companies.  Such an incomplete analysis of countervailable benefits warrants a remand for reconsideration, as it is not in accordance with the CVD law, Commerce's regulations, and is further unsupported by substantial evidence.

### C.    Commerce's Determination To Not Apply AFA To Win-Tel's Affiliate Reporting Was Unsupported By Substantial Evidence And Not In Accordance With Law

As described above, it is imperative that Commerce fully investigate a respondent, including its affiliated suppliers and exporters, to obtain necessary information regarding the full universe of subsidies that benefitted the subject merchandise.  As such, timely disclosed affiliated company responses are necessary to allow Commerce to analyze affiliations, cross-ownership, and trading company relationships for the proper consideration of subsidies to attribute.  To that end, it is well-established that "it is Commerce, not the respondent, that determines what information is to be provided" during an investigation.  *See e.g., Ansaldo Componenti, S.p.A. v. United* States, 628 F. Supp. 198, 205 (Ct. Int'l Trade 1986) ("*Ansaldo Componenti*").

Yet, as demonstrated below, Commerce here allowed Win-Tel to manipulate the outcome of the investigation by unilaterally determining what information it reported regarding affiliates involved in the production and sale of subject merchandise, and worse, to obfuscate information relevant to Commerce's affiliation and attribution analysis.  Commerce erred in doing so, and instead the record of this investigation warranted application of adverse facts available for Win-Tel's failure to provide full and accurate responses.  Thus, for the reasons below, the Court should

remand this case back to Commerce for the agency to reconsider Win-Tel's failures to provide full and accurate reporting regarding its affiliates and the agency's subsequent failure to apply AFA.

### 1.    Legal Framework

Commerce applies facts available to fill gaps in the record if "(1) necessary information is not available on the record, or (2) an interested party…withholds information that has been requested…, fails to provide such information by the deadlines…or in the form or manner requested…, significantly impedes {the} proceeding…, or provides such information but the information cannot be verified." 19 U.S.C. § 1677e(a). If any one or more of these conditions are satisfied, Commerce "shall" use facts available. *See id.*; *see also e.g., Hung Vuong Corp. v. U.S.*, 483 F. Supp. 3d 1321, 1337-38 (Ct. Int'l Trade 2020) ("If 'necessary information is not available on the record,' for any reason, Commerce must use facts otherwise available.").

If Commerce also determines that a respondent has failed to cooperate "to the best of its ability to comply with a request for information," it may then apply an adverse inference from among its selection of facts available. 19 U.S.C. § 1677e(b). Commerce may apply an adverse inference for a respondent's "failure to cooperate to the best of respondent's ability, regardless of motivation or intent." *Nippon Steel*, 337 F.3d at 1382-83. A respondent fails to act to the best of its ability when it does not exert "maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation." *Id.*, at 1382. Moreover, willful concealment and withholding of requested information are the kind of misconduct that fail to meet the "best-of-its-ability" standard. *See Papierfarbik August Koehler SE v. U.S.*, 843 F.3d 1373, 1379 (Fed. Cir. 2016).

### 2. Commerce's Failure to Apply AFA to Win-Tel's Affiliate Reporting was Unlawful and Unsupported by Substantial Evidence

Commerce was legally required to apply facts available due to Win-Tel's failure to accurately report information regarding its affiliates involved in the production and export of subject merchandise. Additionally, substantial evidence demonstrated that adverse inferences were also warranted. Instead, Commerce determined that application of AFA to Win-Tel was not warranted because Win-Tel responded to all of Commerce's requests for information. IDM at 34. As we detail below, Commerce's determination was contrary to the plain language of the statute and unsupported by substantial evidence.

#### *Neelson*

During the investigation, Win-Tel and Neelson failed to submit complete questionnaire responses for cross-owned affiliates of Neelson, failed to submit information regarding suppliers of subject merchandise by making inaccurate statements regarding Neelson's export activities, and failed to submit accurate information regarding its affiliations and changes in ownership during the AUL. Such failures created a gap in the record that should have rendered responses by Win-Tel and Neelson unreliable. But astonishingly, rather than abide by its statutory mandate and apply facts available to fill this gap in the record, Commerce deviated from its duty and refused to apply AFA to Win-Tel for its failure to submit full and accurate information regarding Neelson. *See* IDM at Comments 1, 3, 3B, 3C, 3D. This determination was unlawful and unsupported by substantial evidence.

#### i) *Failure to submit full CVD responses on behalf of cross-owned affiliates.*

As part of the Win-Tel respondents, Neelson should have submitted complete questionnaire responses for its cross-owned affiliated companies involved in the production and sale of subject merchandise. IDM at 37. Win-Tel and Neelson acknowledged in the initial

affiliation response, filed two and half months before Commerce issued its preliminary determination, that Neelson had cross-owned affiliates involved in the production and sale of subject merchandise. *See* Win-Tel's Affiliation Response, Neelson Affiliated Response, at 4-6, Exhibit N-2. Yet, Neelson determined that because Win-Tel was the mandatory respondent, and not Neelson, it need not provide a full CVD questionnaire response for its cross-owned affiliates. *Id.* 6-7. This was in direct defiance of Commerce's instructions to "provide complete responses for certain 'cross-owned' affiliated companies" including cross-owned producers of subject merchandise and input suppliers. *Id.*

This willful act created a gap in the record that should have resulted in the application of facts available by Commerce. *See* 19 U.S.C. § 1677e(a) ("if necessary information is not available on the record…" Commerce "*shall*" use facts otherwise available) (emphasis added); *see also* IDM at 37 ("we find that the record is missing necessary information…"). Additionally, it is clear that Neelson failed to act to the best of its ability by knowingly refraining from submitting the requested information. The courts have long held that a respondent fails to act to the best of its ability when it does not exert "maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation." *See Nippon Steel*, 337 F.3d at 1382. Win-Tel and Neelson's refusal to provide full and complete responses on behalf of Neelson's cross-owned producers in this case falls far short of that standard.

Commerce, in fact, agreed that necessary information was missing from the record regarding Neelson's cross-owned affiliates and their potential use of subsidies under investigation. IDM at 37. However, Commerce claimed that because it supposedly discovered this gap in the record late in the proceeding, it was instead deferring its examination of Neelson's potentially cross-owned affiliates to a subsequent administrative review should Neelson be subject to such a

review.  *Id*. (citing 19 C.F.R. § 351.311(c)(2)).  Such an abdication flies in the face of the statute's mandate to offset the full extent of countervailing duties that benefited the production and export of subject merchandise, and where needed, to fill the gaps in the record with facts available. Additionally, that determination is also contradicted by the record.

Commerce had all the evidence it needed to determine that Neelson's cross-owned affiliate producer of subject merchandise, Neelson Ceramic, was indeed cross-owned.  *See* Win-Tel's Affiliation Response at Exhibit N-3 (demonstrating that Neelson Ceramic LLP [

                         ] as Neelson).  Neelson never questioned the fact that Neelson Ceramic was its cross-owned affiliate.  Moreover, this information did not appear on the record "late in the proceeding" as Commerce claims, but rather it had been on the record for months before even the preliminary determination.  Thus, there is no reasonable excuse for Commerce not to apply AFA to Win-Tel for Neelson's incomplete reporting.

    *ii)   Failure to submit information regarding suppliers of subject merchandise.*

Additionally, the Coalition urged Commerce to also apply AFA to Win-Tel to fill additional gaps in the record created by Win-Tel's failure to report accurate information for unaffiliated suppliers of subject merchandise to Win-Tel, Theos and Neelson.  IDM at Comment 3C.  To this, Commerce responded two-fold.  First, Commerce reiterated the explanation provided in the Respondent Selection Memo that "examining all known exporters or producers would require significant resources for Commerce to analyze each company's corporate structure, financial records, and participation in the alleged subsidy programs on which Commerce has initiated an investigation."  IDM at 38 (citing Respondent Selection Memo, at 3).  Second, Commerce relied on claims by Win-Tel, Theos, and Neelson that "Theos and Neelson did not directly export any ceramic tile to the United States during the POI," and therefore, "by examining

{their} exports of ceramic tile sold through Win-Tel, we are capturing the vast majority of ceramic tile sold by the Win-Tel Respondents during the POI." IDM at 39. Both reasons warrant a remand.

First, Commerce did not cite any statute or regulation that grants it the discretionary authority to limit its examination of suppliers of subject merchandise based on an evaluation of the agency's resources. No such authority exists. Instead, Commerce cited the language from the respondent selection memo invoking 19 U.S.C. § 1677f-1(e)(2) which grants Commerce the discretion to limit its individual examination to a reasonable number of mandatory respondents. *See* Respondent Selection Memo, at 3. But Commerce had already invoked this authority to limit its investigation to Win-Tel and Antiqa. Nothing in the text of 19 U.S.C. § 1677f-1(e)(2) indicates that Commerce may further whittle down its examination and conduct only a partial examination of a mandatory respondent. Therefore, this language from the respondent selection memo does not support Commerce's failure to investigate the unaffiliated suppliers of subject merchandise which exported ceramic tile through Win-Tel and Neelson. Instead, the regulations at 19 C.F.R. § 351.525(c) dictate that Commerce *shall* cumulate the benefits from subsidies provided to producers of subject merchandise with benefits provided to the trading company which exported the merchandise regardless of affiliation.

Second, Commerce's reliance on Win-Tel and Neelson's statement that the Win-Tel respondents only exported ceramic tile through Win-Tel is contradicted by evidence on the record. Neelson did indeed claim that it did not directly export to the United States. *See* Win-Tel's Affiliation Response, Neelson Affiliation Response, at 2. However, the record shows otherwise. Specifically, the CBP data relied on by Commerce to select mandatory respondents demonstrates that Neelson [

]. *See Release of U.S. Customs and Border Protection Entry Data*, at Attachment 1 (May 7,

2024) ("CBP Data") (P.R. 309; C.R. 38-39).    As such, Commerce's reliance on this unsubstantiated claim cannot be sustained.

*iii) Inaccuracies regarding changes in ownership during the AUL*

Finally, another factor that should have weighed in favor of applying AFA to Win-Tel and Neelson was that they hid the fact that during the AUL both companies [

]    When asked directly to report any changes in ownership during the AUL, Neelson reported that "… there is no change in the ownership of Neelson and that majority ownership continues with Makasana and family."  *See* Win-Tel's Affiliation Response, Neelson Affiliated Response, at 7-8.  However, discretely mentioned in a footnote, is the fact that during the AUL [

]  *See id.* at n.1.  Commerce indeed determined that "Win-Tel did not clearly report a certain change in Neelson's ownership during the AUL period."  IDM at 39.

However, again, Commerce gave Win-Tel and Neelson a pass.  Rather than recognizing this misleading reporting as evidence that calls into question the reliability of Win-Tel and Neelson's remaining questionnaire responses, Commerce simply concluded that because this did not result in subsidies received during the AUL to be improperly attributed then AFA was not warranted.  IDM at 39.  Commerce failed to view this in the context of the other inaccuracies and incomplete reporting by Win-Tel and Neelson as noted above.  Such unclear reporting was yet another instance of Win-Tel and Neelson failing to act to the best of its ability to provide Commerce with complete and accurate information.

As detailed above, in its attempt to avoid application of AFA to Win-Tel, Commerce's final determination became riddled with inconsistent statements and findings which are

unsupported by the law or evidence on the record.  As such, this Court should remand this determination for Commerce to reconsider its failure to apply AFA to Win-Tel's inaccurate and incomplete reporting regarding its affiliated supplier, Neelson.

### *Bhabha Exports*

As we again demonstrate, Win-Tel also made facially inconsistent statements regarding other cross-owned entities and failed to provide information necessary for Commerce to analyze the full universe of subsidies that benefited the subject merchandise.  Among them was Win-Tel's failure to provide full and accurate information regarding its [      ] cross-owned exporter of subject merchandise, Bhabha Exports.  *See* Win-Tel's Affiliation Response at Exhibit W-3.  This failure was in direct contravention of Commerce's instructions to "submit complete questionnaire responses for all such trading companies."  *See* Initial Questionnaire, at Section III, B. ("If your company sells the subject merchandise to an export trading company which then exports the subject merchandise to the United States, then you must submit complete questionnaire responses for all such trading companies.").

Win-Tel acknowledged in its affiliation response that Bhabha Exports was a partnership firm involved in the export of subject merchandise.  *See id.* at 4.  Win-Tel additionally reported that Win-Tel and Theos supplied Bhabha Exports with [      ] and [      ] square meters, respectively, of subject merchandise that Bhabha Exports subsequently sold.  *Id.* at n.2.  However, Win-Tel attempted to downplay the role that Bhabha Exports plays in the sale of subject merchandise by stating that "Bhabha Exports did not export any subject merchandise to the United States, except for a very small quantity of free samples…."  *Id.* at 4-5.  Additionally, Win-Tel went even further in its list of affiliates when it stated that [

                                                                                                                    ]

*Id.* at Exhibit W-2 (emphasis added).  As such, these statements are clearly inconsistent, given that

in the first instance Win-Tel acknowledges that Bhabha Exports has exports to the United States

but later claimed that Bhabha Exports [                                        ].  *Compare* Win-Tel's

Affiliation Response at 4-5 *with* Exhibit W-2; *see also Win-Tel's Second Supplemental Response*,

at S2-3 and S2-8 (Aug. 7, 2024) ("Win-Tel's 2SQR") (P.R. 491; C.R. 249) ("These documents

support Win-Tel's statement that Bhabha did not export subject merchandise to the United States,

except for a few samples of very small quantity." *Compare with* "[

          ], Director of Win-Tel, who looks after the operations of Bhabha Exports, engaged in

trading of subject merchandise only to third country (not to USA or domestic market)").  These

claims are inherently inconsistent and unreliable.

Nonetheless, *arguendo*, even if we are to ignore the inconsistent statements and presume

correct Win-Tel's claim that its cross-owned affiliate, Bhabha Exports, only exported a small

quantity of sample sales to the United States during the POI, such activity plainly falls within the

scope of the CVD law.  The plain language of the statute explains that Commerce is to countervail

subsidies received "with respect to the manufacture, production, or export of a class or kind of

merchandise imported, or sold (or likely to be sold) for importation, into the United States."  *See*

19 U.S.C. § 1671(a).  Bhabha Exports undeniably exported subject merchandise to the United

States.  *See* CBP Data (C.R. 38-39).

There is no *de minimis* exemption in the statute for the amount of subject merchandise

exported to the United States that would exempt an exporter from the CVD law.  In fact, Commerce

has explained that "a 'sample sale' is still a sale for the purpose of determining whether a company

under review had entries during the POR."  *See e.g., Crystalline Silicon Photovoltaic Cells,*

*Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of*

*Countervailing Duty Administrative Review; 2022*, 91 Fed. Reg. 3419 (Dep't of Commerce Jan. 27, 2026) and accompanying IDM at 24; *see also Fabrique de Fer de Charleroi, SA v. U.S.*, 25 C.I.T. 567, 604 (2001) ("It is enough that the subsidy was provided, the company used the subsidy to manufacture, produce, or export goods covered by the scope of the order, and that the company actually imported merchandise covered by the scope of the order into the United States.").  As such, Win-Tel should have submitted a full response to Commerce's CVD questionnaire on behalf of its [      ] cross-owned exporter of subject merchandise, Bhabha Exports, which exported merchandise to the United States.

Instead, Win-Tel chose not to submit the information requested because Win-Tel concluded that such information was not relevant to Commerce's investigation.  *See* Win-Tel's Affiliation Response at 5 ("Consequently, Win-Tel does not intend to submit a response for Bhabha.").  Such a conclusion, reached unilaterally with no foundation in statute, is inherently flawed.  Again, it is Commerce, not the respondent, that determines what information is to be provided in an investigation.  *See Ansaldo Componenti*, 628 F. Supp. at 205.  This gap in the record willfully created by Win-Tel's failure to report information regarding its cross-owned exporter of subject merchandise, Bhabha Exports, also warranted application of AFA.

Because of Win-Tel's failure to provide a full CVD questionnaire response from Bhabha Exports, Commerce was unable to offset benefits provided to subject merchandise sold by Win-Tel's cross-owned trader.  The statute is clear, and mandates that Commerce "*shall*" use facts available when "necessary information is not available on the record, or" if an interested party "withhold information that has been requested…."  *See* 19 U.S.C. § 1677e(a).  Additionally, in instances such as this where the respondent fails to cooperate by not acting to the best of its ability

and unilaterally refuses to provide relevant information regarding its cross-owned exporter of subject merchandise, Commerce may apply adverse inferences.  *See id.* at § 1677e(b).

Therefore, Commerce at the very least failed to abide by its statutory mandate when it refused to apply facts available to Win-Tel's failure to provide a full CVD questionnaire on behalf of Bhabha Exports.  *See* IDM at Comment 1 and 3.  Moreover, substantial evidence on the record further confirms that Win-Tel failed to act to the best of its ability because it unilaterally determined that it would not provide the relevant response and repeatedly provided inconsistent representations of Bhabha Exports' sales activities.  *See* Win-Tel's Affiliation Response at 4-5 *with* Exhibit W-2; *see also* Win-Tel's 2SQR at S2-3 and S2-8.  As such, Commerce's failure to apply an adverse inference to Win-Tel for its failure to provide a complete and accurate questionnaire response for Bhabha Exports is also unsupported by substantial evidence.

### D.    Commerce's Application of AFA to the SGOG's Provision of Gas for LTAR Program and Benchmark Calculation was Unlawful and Unsupported by Substantial Evidence

In its final determination, Commerce properly determined that AFA was warranted for the SGOG's Gas for LTAR program because the GOI repeatedly failed to provide information requested by Commerce.  IDM at 46-47; *see also* PDM 9-10.  However, Commerce's application of "adverse inferences" to the GOI in this case allowed it to benefit from its own noncooperation. *Cf. Statement of Administrative Action accompanying the Uruguay Round Agreements Act*, reprinted in 1994 U.S.C.A.A.N. 4040,4199 ("SAA") ("Commerce may employ adverse inferences about the missing information to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully").  Thus, an application of AFA which results in a no benefit determination is contrary to statutory intent of the AFA provisions.  Furthermore, Commerce's calculation of the gas benchmark was unsupported by substantial evidence and not in accordance with practice.

### 1. Legal Framework

#### a. Adverse Inferences

As previously explained, when necessary information is not available or an interested party withholds information requested by Commerce, and Commerce determines that the interested party failed to cooperate by not acting to the best of its ability, Commerce applies adverse facts available or AFA. *See* 19 U.S.C. § 1677e(a)-(b). When applying an adverse inference, Commerce may rely on information derived from any stage of the proceeding, including the petition. 19 U.S.C. § 1677e(b); *see also* 19 C.F.R. § 351.308(c). Additionally, the AFA rate generally incorporates a "built-in increase intended as a deterrent to non-compliance." *See e.g., BMW of North America LLC v. U.S.*, 926 F.3d 1291, 1300 (Fed. Cir. 2019); *see also Essar Steel, Ltd. v. U.S.*, 753 F.3d 1368, 1373 (Fed. Cir. 2014). Commerce may also apply an adverse inference based on the government's failure to provide requested information, even where the mandatory respondents cooperate. *See e.g., Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1371-73 (Fed. Cir. 2014) ("*Fine Furniture*") (affirming Commerce's application of adverse inferences when the government of China did not provide requested information despite the respondents' cooperation); *KYD, Inc. v. United States*, 607 F.3d 760, 768 (Fed. Cir. 2010) (finding that a collateral impact on a cooperating party does not render the application of adverse inferences improper).

#### b. Benchmark Selection

When determining whether government-subsidized goods have been provided for LTAR, Commerce must identify a benchmark price to compare with the price of goods receiving the government subsidy. 19 C.F.R. § 351.511. The statute further states that the adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service being provided in the country in which subject to the investigation or review. 19 U.S.C.

§ 1677(5)(E).  Commerce's regulations set forth a three-tiered hierarchy to identify the appropriate benchmark.  First, Commerce prefers to look for a "tier 1" benchmarks that allow it to compare actual transaction prices in the country in question to the government prices for a good.  19 C.F.R. § 351.511(a)(2)(i).  When actual transactions in the subject market are not available, Commerce uses a "tier 2" benchmark by drawing on world market prices and taking the average of that data while making due allowance for factors affecting comparability.  *Id.* at § 351.511(a)(2)(ii).  Finally, if no world market prices are available then Commerce assesses whether the government price is consistent with market principles.  *Id.* at § 351.511(a)(2)(iii).

### 2.    Commerce's Application of AFA and Benchmark Calculation for the Gas for LTAR Program is Unlawful and Unsupported by Substantial Evidence

Among the information that the GOI failed to provide was information necessary to determine a proper benchmark price for gas purchases in India, including: total volume and value of domestic consumption of natural gas; total volume and value of domestic production that is accounted for by companies in which the GOI maintains an ownership/management interest either directly or through other government entities; and laws, plans or policies that address the pricing of natural gas and the levels of production of natural gas.  IDM at 46.  Thus, the GOI's failure to cooperate deprived Commerce of evidence relevant for determining a proper benchmark price to calculate a benefit.  Subsequently, Commerce determined that as an adverse inference, India's domestic market for natural gas is distorted such that it was not appropriate to use domestic "tier one" benchmarks to measure the benefit under the gas for LTAR program.  Because gas prices outside of India are lower than prices within India, Commerce's application of AFA benefitted the GOI and removed any future incentive to cooperate.

In determining the most appropriate proxy for a benchmark price for natural gas Commerce followed its past practice in *QSP from India CVD* and relied on world price data sourced from UN

Comtrade.[6]  PDM at 18-19; IDM at 8.  In doing so, Commerce forewent the regulatory and statutorily preferred method of relying on prices and market conditions in the subject country.  19 U.S.C. § 1677(5)(E); 19 C.F.R. § 351.511(a)(2)(i).  Moreover, Commerce's determination in *QSP from India CVD* should have served as a warning to avoid a similar AFA approach given that in that case the GOI also refused to provide relevant benchmark information and there too Commerce made a no benefit determination for the gas for LTAR program.  *See Certain Quartz Surface Products from India: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances, in Part*, 85 Fed. Reg. 25,398 (Dep't of Commerce May 1, 2020) and accompanying IDM at Comment 3.  Hence, Commerce's claim that in this case it "ensured that the GOI, and the mandatory respondents, did not obtain a more favorable result due to the government's failure to cooperate" is not borne out by the fact that Commerce determined that no benefit was provided by the program.  IDM at 43.

Commerce additionally claimed that "there is no basis to apply AFA to determine a benefit to the mandatory respondents exists under this program."  IDM at 44.  However, this claim ignores the fact that when evaluating benchmarks to determine whether a benefit exists under an LTAR program, Commerce does indeed require information from the foreign government.  *See Fine Furniture*, 748 F.3d at 1370 ("Commerce sometimes requires information from a foreign government to determine whether a particular respondent received a benefit from an alleged subsidy"); *see also* 19 C.F.R. § 351.511.  Thus, by failing to provide the requested information, the GOI impeded Commerce's ability to determine a proper benchmark, and there was a basis for application of AFA in determining a natural gas benchmark.

---

[6] Although Commerce discredited the relevance of *QSP from India CVD* for purposes of Antiqa's cross-ownership analysis, it relied on this very same determination as support for its benchmark analysis in the gas for LTAR program.

Moreover, Commerce ignored the Coalition's request to use alternative benchmarks, and instead relied on partial information provided by the GOI, the same party whose lack of cooperation resulted in AFA, to determine that the Indian domestic market was distorted and that no natural gas pipelines exist connecting India with any foreign supplier of natural gas.  PDM at 17 (citing to the GOI's September 4th First Supplemental Questionnaire); IDM at 45-47.  This information was never verified; indeed, Commerce never verified any information related to SGOG's gas for LTAR program.  *See generally Verification of the Questionnaire Responses of the Government of India* (Feb. 11, 2025) ("GOI's Verification Report") (P.R. 694).  However, this was the information in which Commerce relied on to decline use of the data in Global LNG Market: Supply-Demand and Economic Analysis report, or to solely rely on the data in the UN Comtrade data of Indian export prices of natural gas.  PDM at 17-18; IDM at 45-47.

Finally, Commerce's use of the UN Comtrade data to calculate a benchmark contains several errors, is unsupported by substantial evidence, and should be rendered invalid by this Court.  First, Commerce indicated that it would apply the conversion factor that 1 SCM is equal to 0.829 kilograms for purposes of calculating the proper gas benchmark in using the UN Comtrade database.  IDM at 8-9.  However, in reviewing the UN Comtrade data used by Commerce to calculate the natural gas benchmark, it is apparent that the data does not consistently reflect the use of the 0.829 KG to SCM conversion factor which Commerce stated it would use for purposes of the final determination.  *See Final Determination Calculations for Win-Tel Ceramics Private Limited*, at Attachment 2, tab "UN Comtrade Filtered (C2)," (April 16, 2025) ("Win-Tel Final Calc Memo") (P.R. 734; C.R. 550-551); *see also Final Determination Calculations for Antiqa Mineral*, at Attachment 2, tab "UN Comtrade Filtered (C2)," (April 16, 2025) ("Antiqa Final Calc Memo") (P.R. 733; C.R. 548-549).

For example, a review of the export data from Canada and U.S., which account for a considerable portion of the total quantity of exports in the UN Comtrade data, reveals that the implied kg to cubic meter conversion factor is inaccurately applied for all observations if one uses both the kg and cubic meters reported. *See id.* Instead, Commerce should have reviewed the UN Comtrade database to ensure that all data were correctly converted from KG to SCM using the intended conversion factor. However, when made aware of this inaccuracy in the database, Commerce's response was that for data already reported in a SCM unit of measure there is no need to ensure that data was properly converted when reported. *See* Ministerial Error Memo at 4. Essentially, if the data already in the UN Comtrade database was reported inaccurately, even if the evidence is there to determine as much, Commerce need not correct it. Such a determination should not stand and warrants reconsideration because it failed to calculate margins as accurately as possible. *See Rhone Poulenc, Inc. v. U.S.*, 899 F.2d 1185, 1191 (Fed. Cir. 1990) (highlighting that "the basic purpose of the statute" is to "determine current margins as accurately as possible").

Additionally, Commerce was inconsistent in its approach on what prices it would include in calculating the natural gas benchmark. Commerce explained that it was removing from the UN Comtrade data prices from non-market economies such as China and Russia because prices in non-market economies are, by definition, not consistent with market principles. PDM at 18; *see also* Antiqa Final Calc Memo, at Attachment 2, tab "UN Comtrade Filtered (C2),"; Win-Tel Final Calc Memo, at Attachment 2, tab "UN Comtrade Filtered (C2)." However, Commerce continued to include prices from non-market economies such as Georgia, Kyrgyzstan, Tajikistan and the Republic of Moldova in its benchmark data. *See* Antiqa Final Calc Memo, at Attachment 2, tab "UN Comtrade Filtered (C2),"; Win-Tel Final Calc Memo, at Attachment 2, tab "UN Comtrade Filtered (C2)." All countries which Commerce has designated as non-market economy countries.

*See* "Countries Currently Designated By Commerce As Non-Market Economy Countries," https://www.trade.gov/nme-countries-list (last visited Feb. 23, 2026).

In sum, Commerce's benchmark data does not accurately reflect Commerce's own intended methodology, much less any reasonable application of AFA for the GOI's lack of cooperation. As such, this Court should remand Commerce's benchmark price for the gas for LTAR program as it is unlawful and unsupported by substantial evidence.

### E.   Commerce's Failure to Initiate on the Minerals for LTAR Upstream Allegation was Unlawful and Unsupported by Substantial Evidence

Lastly, Commerce erred when it determined not to initiate on the Coalition's upstream subsidy allegations. The Coalition filed upstream subsidy allegations based on public information reasonably available at the time that there were reasonable grounds to believe or suspect that respondents benefited from upstream subsidies to the raw material inputs including through the provision of minerals for LTAR. However, Commerce declined to initiate on this allegation because the Coalition's "allegation is an allegation that there is a direct provision of a subsidy by an authority to the mandatory respondents…" and therefore, "constitutes an untimely new subsidy allegation, not a timely upstream subsidy allegation." IDM at 81.

The statute provides that whenever Commerce "has reasonable grounds to believe or suspect" that an upstream subsidy is bestowed then Commerce shall initiate an inquiry. 19 U.S.C. § 1671(e). A subsidy allegation functions much "like a civil complaint" and is intended "to alert the agency to the possibility of a subsidy." *RZBC Grp. Shareholding Co. v. U.S.*, 100 F. Supp. 3d 1288, 1292 (Ct. Int'l Trade 2015). The bar for launching a CVD inquiry is typically low and most subsidy petitions are granted unless the allegations are clearly frivolous, not reasonably supported by the facts or omit important facts which are reasonably available to the petitioner. *See Nucor Corp. v. U.S.*, 600 F. Supp. 3d 1225, 1234 (Ct. Int'l Trade 2022); *see also RZBC Grp.*, 100 F.

43

Supp. 3d at 1295.  Additionally, Commerce has an affirmative duty to investigate any appearance of subsidies related to the investigation that are discovered during an investigation.  *POSCO*, 977 F.3d at 1378 (citing 19 U.S.C. § 1677d).

Here, Commerce did not argue that the Coalition's allegation of the provision of minerals for LTAR lacked sufficient evidentiary support.  Instead, Commerce declined to investigate the Coalition's allegation because it determined the allegation better fit its definition of a direct new subsidy allegation rather an upstream subsidy allegation.  IDM at 81.  However, the legislative history makes it clear that the intent of Congress in enacting the Trade and Tariff Act of 1984 was to broaden Commerce's ability to examine upstream subsidies when companies are not cross-owned, not to restrict the Department's abilities to countervail subsidies received by cross-owned companies.  *See Report of the House Committee on Ways and Means*, H.R. Rep. No. 98-725 (1984).  As such, Commerce unnecessarily restricted its own ability to investigate and countervail subsidies allegedly received by cross-owned companies such as Theos.

By doing so, Commerce ignored its duty to investigate the appearance of subsidies provided to affiliated entities through the provision of minerals for LTAR.  *See POSCO*, 977 F.3d at 1378.  As such, this Court should remand Commerce's refusal to initiate an investigation into the provision of minerals for LTAR program for reconsideration.

## VI.  <u>**CONCLUSION**</u>

For these reasons, we respectfully request that the Court grant the motion for judgment on the agency record, hold that Commerce's final determination is unsupported by substantial evidence and otherwise not in accordance with law, remand this matter to Commerce for disposition consistent with the opinion and order of the Court, and order any additional relief the Court may deem just and proper.

Respectfully submitted,

_____
David M. Spooner, Esq.
Christine J. Sohar Henter, Esq.
Hendricks Valenzuela, Esq.

BARNES & THORNBURG LLP
555 12th Street, NW, Suite 1200
Washington, D.C. 20004
(202) 371-6377

*Counsel to Plaintiff*
*The Coalition for Fair Trade in Ceramic Tile*

Date: <u>March 10, 2026</u>

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing brief contains 13,602 words (including text, quotations, footnotes, headings, and attachments) and therefore complies with the word limitation set forth in this Court's Scheduling Order.  In preparing this certificate of compliance, I have relied on the word count function of the word processing system used to prepare the brief.


Date: <u>March 10, 2026</u>                                   

David M. Spooner

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE JOSEPH A. LAROSKI, JR., JUDGE**

COALITION FOR FAIR TRADE IN
CERAMIC TILE,

      Plaintiff,

v.

UNITED STATES,

      Defendant,

and

WIN-TEL CERAMICS PRIVATE LTD.,
ANTIQA MINERALS, and
M.S. INTERNATIONAL, INC.

      Defendant-Intervenors.

Court No. 25-00152

## <u>ORDER</u>

Upon consideration of the motion for judgment on the agency record filed by plaintiff, the Coalition for Fair Trade in Ceramic Tile (the "plaintiff"), the responses thereto filed by defendant and the defendant-intervenors, the plaintiff's reply, the administrative record, all other papers and proceedings herein, and upon due deliberation, it is hereby

**ORDERED** that the plaintiff's motion for summary judgment on the agency record is **GRANTED**; it is further

**ORDERED** that the U.S. Department of Commerce's final determination in the countervailing duty investigation of ceramic tile from India is remanded for disposition consistent with this Court's opinion and order; and it is further

**ORDERED** that Commerce shall file its remand redetermination within ninety (90) days of this date; and it is further

**ORDERED** that Commerce shall file the administrative record for the remand proceeding within fourteen (14) days of the date of the filing of its remand redetermination; and it is further

**ORDERED** that the parties shall have thirty (30) days to file comments on the remand redetermination; and it is further

**ORDERED** that the parties shall have thirty (30) days to file replies to the comments on the remand redetermination; and it is further

**ORDERED** that the parties shall file the joint appendix within fourteen (14) days after the deadline to file replies to the comments on the remand redetermination.

**SO ORDERED.**

Date: _____          _____
      New York, New York                   Honorable Joseph A. Laroski, Jr., Judge
                                            U.S. Court of International Trade