**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE JOSEPH A. LAROSKI, JR., JUDGE**

| | |
|---|---|
| COALITION FOR FAIR TRADE IN CERAMIC TILE,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>WIN-TEL CERAMICS PRIVATE LTD., ANTIQA MINERALS, and M.S. INTERNATIONAL, INC.,<br><br>Defendant-Intervenors. | **PUBLIC VERSION**<br><br>**BPI removed from brackets on pages 7-8, 11, 16-18, 20, 23-24**<br><br>Court No. 25-00152 |

**PLAINTIFF'S REPLY BRIEF**
**FOR JUDGMENT ON THE AGENCY RECORD**

David M. Spooner, Esq.
Christine J. Sohar Henter, Esq.

BARNES & THORNBURG LLP
555 12th St. NW, Suite 1200
Washington, D.C. 20004
(202) 371-6377

*Counsel to Plaintiff*
*Coalition for Fair Trade in Ceramic Tile*

Dated: October 29, 2026

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................... ii

I. INTRODUCTION ................................................................................................ 1

II. ARGUMENT ....................................................................................................... 1

A. Commerce's Application of AFA with Respect to the Provision of Gas for LTAR Was Unlawful and Unsupported by Substantial Evidence .................................... 2

B. Remand Is Warranted Because Commerce Unlawfully Failed to Investigate the Cross-Owned Affiliates Necessary to Accurately Attribute Subsidies to Win-Tel 6

C. Commerce's Cross-Ownership and Attribution Analysis of Antiqa Affiliates Is Unsupported by Substantial Evidence and Not in Accordance with Law ............ 11

D. Defendant-Intervenors' Failure-to-Exhaust Arguments Lack Merit Because Commerce Considered and Decided the Issues Presented .................................. 21

E. Commerce's Decision to Not Initiate on the Minerals for LTAR Upstream Allegation Was Unlawful and Unsupported by Substantial Evidence ................. 23

III. CONCLUSION ................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allegheny Ludlum Corp. v. United States*, 24 CIT 452 (2000) ........ 8, 11

*Baroque Timber Indus. (Zhongshan) Co. v. United States*, 776 F. Supp. 3d 1290 (Ct. Int'l Trade 2025) ........ 10

*Bethlehem Steel Corp. v. United States*, 25 CIT 307 (2001) ........ 8, 9

*China Cornici Co. v. United States*, 799 F. Supp. 3d 1373 (Ct. Int'l Trade 2025) ........ 9

*Essar Steel, Ltd. v. United States*, 753 F.3d 1368 (Fed. Cir. 2014) ........ 3

*F.lli De Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027 (Fed. Cir. 2000) ........ 3, 4

*Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365 (Fed. Cir. 2014) ........ 5

*Hebei Metals & Minerals Imp. & Exp. Corp. v. United States*, 366 F. Supp. 2d 1264 (Ct. Int'l Trade 2005) ........ 10

*Hitachi Energy USA Inc. v. United States*, 34 F.4th 1375 (Fed. Cir. 2022) ........ 10

*Hyundai Steel Co. v. United States*, 282 F. Supp. 3d 1332 (Ct. Int'l Trade 2018) ........ 10

*Lashify, Inc. v. Int'l Trade Comm'n*, 130 F.4th 948 (Fed. Cir. 2025) ........ 9

*Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003) ........ 17

*Nucor Corp. v. United States*, 600 F. Supp. 3d 1225 (Ct. Int'l Trade 2022) ........ 22, 24

*Olympia Indus., Inc. v. United States*, 22 CIT 387 (1998) ........ 10

*POSCO v. United States*, 977 F.3d 1369 (Fed. Cir. 2020) ........ 16, 17, 24

*Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185 (Fed. Cir. 1990) ........ 6

*RZBC Grp. Shareholding Co. v. United States*, 100 F. Supp. 3d 1288 (Ct. Int'l Trade 2015) ........ 24

*Sandvik Steel Co. v. United States*, 164 F.3d 596 (Fed. Cir. 1998) ........ 22

*SKF USA Inc. v. United States*, 263 F.3d 1369 (Fed. Cir. 2001) ........ 21

*Tai Shan City Kam Kiu Aluminum Extrusion Co., Ltd. v. United States*, 125 F. Supp. 3d 1337 (Ct. Int'l Trade 2015)....................4

*Wheatland Tube Co. v. United States*, 161 F.3d 1365 (Fed. Cir. 1998) ....................15

**Statutes**

19 U.S.C. § 1671(a) ....................13

19 U.S.C. § 1671(e) ....................24

19 U.S.C. § 1677-1(a)....................23

19 U.S.C. § 1677d....................6, 8

19 U.S.C. § 1677e(d)(3)(A) ....................4

19 U.S.C. § 1677m(d)....................6, 7, 10

19 U.S.C. § 1677m....................8

28 U.S.C. § 2637(d) ....................21

**Regulations**

19 C.F.R. § 351.308(j) ....................3

19 C.F.R. § 351.311 ....................6, 8, 9

19 C.F.R. § 351.311(b) ....................9

19 C.F.R. § 351.311(c)(2)....................6, 9

19 C.F.R. § 351.523(a)(1)....................23, 24

19 C.F.R. § 351.525(b)(6)....................12, 13, 14, 19

19 C.F.R. § 351.525(c)....................13, 14, 17, 23

**Administrative Determinations**

*Bottom Mount Combination Refrigerator-Freezers from the Republic of Korea: Final Affirmative Countervailing Duty Determination*, 77 Fed. Reg. 17,410 (Dep't of Commerce Mar. 26, 2012), and accompanying Issues and Decision Memorandum....................15, 16

*Ceramic Tile from India: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination, In Part*, 90 Fed. Reg. 17,036 (Dep't of Commerce Apr. 23, 2025), and accompanying Issues and Decision Memorandum ........ *passim*

*Ceramic Tile from India: Preliminary Negative Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 89 Fed. Reg. 95,182 (Dep't of Commerce Dec. 2, 2024), and accompanying Preliminary Decision Memorandum ........ 12

*Certain Quartz Surface Products from India: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances, In Part*, 85 Fed. Reg. 25,398 (Dep't of Commerce May 1, 2020), and accompanying Issues and Decision Memorandum ........ 20, 21

**Other Authorities**

*Countervailing Duties*, 63 Fed. Reg. 65,348 (Dep't of Commerce Nov. 25, 1998) (final rule) ........ 12, 13, 18

H.R. Rep. No. 98-725 (1984) ........ 25

## I. INTRODUCTION

On behalf of the Coalition for Fair Trade in Ceramic Tile ("the Coalition" or "Plaintiff"), we respectfully submit the following reply brief to the briefs in opposition filed by Defendant, the United States ("Government" or "Commerce") on June 15, 2026 ("Gov't Br.") ECF No. 33 (Confidential) and ECF No. 34 (Public), and Defendant-Intervenors, Win-Tel Ceramics Private Ltd., Antiqa Minerals, and M.S. International, Inc. (collectively, "Defendant-Intervenors") on August 14, 2026 ("Def.-Intervenors Br.") ECF No. 38 (Confidential) and ECF No. 39 (Public).

## II. ARGUMENT

Commerce's final determination in this countervailing duty investigation is not supported by substantial evidence and is contrary to law. *See Ceramic Tile from India: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination, In Part*, 90 Fed. Reg. 17,036 (Dep't of Commerce Apr. 23, 2025) ("Final Determination"), and accompanying Issues and Decision Memorandum ("IDM") (P.R. 729). Neither Defendant nor Defendant-Intervenors raise arguments that undermine Plaintiff's opening arguments.

First, Commerce unlawfully applied adverse facts available ("AFA") in response to the Government of India's failure to cooperate concerning the provision of gas for less than adequate remuneration ("LTAR") and in selecting a benchmark that yielded a zero percent subsidy margin, contrary to the purpose of AFA and Commerce's regulations. Additionally, Commerce's benchmark calculation contains unresolved conversion errors that render the resulting margin inaccurate and unsupported by substantial evidence.

Second, Commerce failed to investigate Neelson's cross-owned affiliates despite timely disclosures and repeated requests from the Coalition. The missing information constituted a

reporting deficiency, not a newly discovered subsidy warranting deferral. Commerce's failure to issue a deficiency notice further undermines its determination.

Third, Commerce improperly excluded subsidies received by Antiqa's affiliated companies. Commerce's narrow application of the attribution regulations disregarded Shivam's common ownership and role in exporting subject merchandise, produced contradictory cross-ownership findings, and failed to adequately consider the Antiqa Kundariya family's ownership and managerial control of Marbonite.

Fourth, the Coalition exhausted its administrative remedies. Commerce considered and decided the challenges to its treatment of Shivam, Luxgres, and Marbonite, and Defendant-Intervenors cannot avoid judicial review by recasting those challenges as unexhausted arguments.

Finally, Commerce improperly declined to investigate the Coalition's upstream subsidy allegation concerning minerals for LTAR. By mischaracterizing the alleged benefit to upstream input suppliers as a direct subsidy to respondents, Commerce failed to apply the statutory and regulatory initiation standards.

These errors undermine the accuracy of the CVD margin calculation and legality of Commerce's determination and warrant remand for further investigation and reconsideration.

### A. Commerce's Application of AFA with Respect to the Provision of Gas for LTAR Was Unlawful and Unsupported by Substantial Evidence

The Government of India ("GOI") failed to respond to Commerce's inquiries about the provision of gas for LTAR. Commerce, therefore, declared that it would resort to AFA to ensure "that the GOI, and the mandatory respondents, did not obtain a more favorable result due to the government's failure to cooperate." IDM at 43. Commerce found, as AFA, that the Indian market for gas was distorted by government intervention. This supposed application of AFA, though, benefited both the GOI and respondents. Commerce's declaration that the Indian gas market was

distorted by government intervention led Commerce to look outside of India for its benchmark to calculate the subsidy benefit (Commerce utilized UN Comtrade data). World prices for gas are lower than gas prices within India, so the use of UN Comtrade data resulted in Commerce calculating a zero percent margin for this program. Commerce's decision to employ AFA in a manner that benefited both the GOI and respondents, yielding a finding of no benefit for this program, was contrary to law—and Commerce's assertion that its application of AFA failed to benefit the Indian interested parties is unsupported by substantial evidence.

The Government argues that "any effect that Commerce's application of AFA on the ultimate CVD rate is immaterial." Gov't Br. at 39. Not so. The purpose of AFA is to ensure that a respondent does not obtain a more favorable rate by failing to cooperate. *F.lli De Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000); *see also Essar Steel, Ltd. v. U.S.*, 753 F.3d 1368, 1373 (Fed. Cir. 2014). Indeed, Commerce's regulations require the application of AFA in a countervailing duty proceeding to result in a higher than *de minimis* margin for the program, even when the respondents have cooperated. 19 C.F.R. §351.308(j).

The Government asserts that Commerce "met the statutory intent" of applying AFA by finding the Indian market was distorted by the GOI's dominance. Gov't Br. at 38 (quoting IDM at 43). It is unclear how this is true when Commerce's AFA methodology yielded a zero percent margin for the program. In fact, application of an AFA methodology that rewards both the GOI and respondents with a zero percent margin is contrary to law, because it incentivizes non-cooperation. It explicitly violates 19 C.F.R. §351.308(j), which requires Commerce in a countervailing duty investigation to impose a higher than *de minimis* margin when applying AFA, even when respondents have cooperated. Commerce's finding also is unsupported by substantial

evidence. There is absolutely no evidence on the record that Commerce's AFA methodology "ensured that the GOI, and the mandatory respondents, did not obtain a more favorable result due to the government's failure to cooperate" or that the "inference that the Indian gas market is distorted is adverse to the GOI." *Id.* at 38–39.

The Government also asserts that, "when applying AFA, Commerce is not required 'to estimate what the countervailable subsidy rate . . . would have been if the interested party found to have failed to cooperate…had cooperated.'" Gov't Br. at 39 (citing 19 U.S.C. §1677e(d)(3)(A)). This argument is inconsistent with the Government's assertions that its methodology ensured that the GOI and respondents failed to obtain a more favorable result as a consequence of the GOI's non-cooperation and it ignores the above-cited regulatory requirement that AFA must result in a higher than *de minimis* margin. 19 U.S.C. §1677e(d)(3)(A). It was enacted to allow Commerce to be punitive, not lenient, in applying AFA, overturning the holding in *F.lli De Cecco di Filippo Fara S. Martino S.p.A.* that an AFA rate must be a reasonably accurate estimate of the respondent's actual rate. 216 F.3d at 1032. *See, e.g., Tai Shan City Kam Kiu Aluminum Extrusion Co., Ltd. v. United States*, 125 F. Supp. 3d 1337, 1347 (Ct. Int'l Trade 2015) (noting that Congress, in enacting §1677e(d)(3), reduced Commerce's burden in justifying an AFA rate).

The record includes alternative information that Commerce could use as a benchmark that would, in fact, result in a greater-than-zero subsidy determination with respect to the provision of gas at LTAR. As Commerce noted in its final determination, the Coalition suggested several alternative benchmarks, including (1) using data in a "Global {Liquid Natural Gas (LNG)} Market: Supply-Demand and Economic Analysis" report; and (2) using the one transaction of an Indian export of natural gas to Nepal in the UN Comtrade data, after converting the quantity basis from

kilograms to cubic meters. IDM at 45. Commerce could credibly utilize these alternative benchmarks in an application of AFA.

Defendant-Intervenors, citing several cases, posit that Commerce should use their proffered benchmark (the UN Comtrade data) because it is "settled practice that Commerce may rely on a cooperating respondent's own verified data to measure benefit, even when it applies AFA to a foreign government." Def.-Intervenors Br. at 30. This argument fails in two respects.

First, the Coalition has never urged Commerce to reject respondents' data. Commerce is free to utilize the respondents' reported information regarding their purchases and consumption of gas. The benchmark – the UN Comtrade data – does not constitute "respondent's own verified data." Second, the cases cited by Defendant-Intervenors actually support the Coalition's argument that Commerce should impose a margin on a cooperating respondent when the Government fails to cooperate. *See, e.g., Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1372-73 (Fed. Cir. 2014) (upholding Commerce's imposition of an AFA margin when faced with a cooperative respondent and a non-cooperative Chinese Government (Commerce chose the highest electricity rate on the record with respect to electricity for LTAR) and noting "a remedy that collaterally reaches Fine Furniture has the potential to encourage the government of China to cooperate.").

Should the Court determine that Commerce appropriately applied AFA, Commerce's use of the UN Comtrade data to calculate a benchmark contains several calculation errors and is unsupported by substantial evidence. In its final determination, Commerce, at the urging of the Coalition, decided to apply the conversion factor of 1 SCM to 0.829 kilograms for purposes of calculating the proper gas benchmark in using the UN Comtrade database. IDM at 8–9. However, the UN Comtrade data used by Commerce to calculate the natural gas benchmark did not

consistently reflect the use of the conversion factor which Commerce stated it would use for purposes of the final determination. *Final Determination Calculations for Win-Tel Ceramics Private Limited*, at Attachment 2, tab "UN Comtrade Filtered (C2)," (P.R. 734; C.R. 550–551); *Final Determination Calculations for Antiqa Mineral*, at Attachment 2, tab "UN Comtrade Filtered (C2)," (P.R. 733; C.R. 548–549). In its ministerial error submission, the Coalition informed Commerce that the UN Comtrade data conversions were incorrect and urged Commerce to correct this inconsistency. Commerce declined to do so, arguing that the inconsistent KG to SCM conversions in its chosen benchmark were a methodological choice and not a mathematical error. *Analysis of Ministerial Error Allegation* at 3 (P.R. 745). The Government repeats this argument in its response brief. Gov't Br. at 42–43. Such a determination should not stand given the calculated margin is inaccurate. *See Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990) (highlighting that "the basic purpose of the statute" is to "determine current margins as accurately as possible").

### B. Remand Is Warranted Because Commerce Unlawfully Failed to Investigate the Cross-Owned Affiliates Necessary to Accurately Attribute Subsidies to Win-Tel

Commerce failed to fulfill its affirmative duty to investigate key cross-owned affiliates to properly attribute subsidies to Win-Tel, leaving gaps in the record that undermine the accuracy of Win-Tel's CVD rate. Pl. Br. at 27–37. The Government and Defendant-Intervenors defend Commerce's decision on two grounds: (1) Neelson's cross-owned affiliates were discovered too late to investigate under 19 C.F.R. §351.311(c)(2), and (2) Commerce could not apply facts available without first notifying Win-Tel of deficiencies under 19 U.S.C. §1677m(d). Gov't Br. at 27–32; Def.-Intervenors Br. at 24–29. Neither argument withstands scrutiny. Commerce had notice of Neelson's cross-owned affiliates months before its final determination, and its failure to

issue a deficiency notice establishes a violation of §1677m(d), not a defense. Remand is therefore warranted.

### 1. Commerce Had Timely Notice of Neelson's Cross-Owned Affiliates and Improperly Deferred Their Investigation

The record refutes the Government's claim that Neelson's affiliates came to light "late in the proceeding." Gov't Br. at 28; *see* Pl. Br. at 30–31. Win-Tel disclosed Neelson's cross-ownership with Neelson Ceramic on July 8, 2024, "two and half months before Commerce issued its preliminary determination" and more than nine months before the Final Determination. Pl. Br. at 30; *see* Win-Tel's Affiliation Questionnaire Response ("Win-Tel's AQR") (P.R. 394; C.R. 51–54). Neelson is Win-Tel's second-largest supplier of subject merchandise, and Neelson Ceramic is Neelson's [ ] cross-owned affiliate that also produces and exports subject merchandise, including to the United States. Pl. Br. at 6, 31; Win-Tel's AQR at 4–5, Exhibit N-3 (P.R. 394; C.R. 51–54); IDM at 38–39.

The Government concedes the gap in the record and defends only Commerce's decision to defer addressing it. Gov't Br. at 28. Commerce itself agreed, though, that "Neelson should have submitted complete questionnaire responses for its cross-owned affiliated companies." IDM at 37. Commerce cannot reasonably rely on Win-Tel's shifting representations about Neelson's affiliations in lieu of complete responses. Win-Tel represented that Neelson exported to the United States only through Win-Tel, yet Win-Tel conceded that Neelson Ceramic, "may have exported to various countries including USA." Win-Tel Rebuttal Comments on Affiliated Companies Questionnaire at 6 (P.R. 443; C.R. 103).

Additionally, the U.S. Customs and Border Protection ("CBP") data lists Neelson Ceramic as [ ]. Win-Tel Rebuttal Comments on Affiliated Companies Questionnaire at 6 (P.R. 443; C.R. 103); CBP Entry Data (P.R. 309; C.R. 38–39). Win-Tel

likewise reported "no change in the ownership of Neelson" while disclosing, only in a footnote, that [ ] during the AUL period, a reporting inconsistency that Commerce itself acknowledged was "not clear." Gov't Br. at 34. Neelson also [ ], a trading company [ ] owned by the Win-Tel Kundariya family. Win-Tel's Section III QR Response at Exhibit N-10(c) (P.R. 484; C.R. 191); Pl. Br. at 6. Yet Commerce failed to investigate any of these inconsistencies that were on record well before the Final Determination.

The Coalition asked Commerce five times, over five months, to fully investigate Neelson's cross-owned affiliates, beginning just two weeks after Win-Tel's AQR and continuing through verification. *See, e.g.*, Petitioner's Cmts. to Win-Tel's First Sec. III QR at 10–14 (P.R. 413; C.R. 96); Petitioner's Cmts. to Win-Tel's Second Sec. III QR at 27, 44–46 (P.R. 533; C.R. 293); Petitioner's Cmts. to Win-Tel's Third Sec. III Supp. QR at 8–10 (P.R. 589; C.R. 365); Petitioner's Pre-Prelim. Cmts. at 12–17 (P.R. 619; C.R. 402); Petitioner's Pre-Verification Cmts. at 2, 9–10 (P.R. 672; C.R. 464). Commerce was put on notice of the Neelson issues early and often, not late.

Commerce has an affirmative duty to investigate subsidies discovered during the investigation, and its failure to consider record evidence that provides significant support for an alternative conclusion renders its determination unsupported by substantial evidence. Pl. Br. at 31–34; *Allegheny Ludlum Corp. v. United States*, 24 CIT 452, 462, 479 (2000); *Bethlehem Steel Corp. v. United States*, 25 CIT 307, 312–313 (2001); 19 U.S.C. §1677d. Remand is warranted for Commerce to investigate the subsidies that should be cumulated to Win-Tel.

The Government next contends that §351.311 "provides no limit for the types of subsidies to which it applies" and that Commerce properly deferred because it lacked time to investigate before the final determination. Gov't Br. at 27–30; *see also* IDM at 37. But §351.311 governs

newly discovered practices "not alleged or examined in the proceeding." 19 C.F.R. §351.311(b)–(c). The subsidy programs at issue were already under investigation; the only missing information was the identity of Neelson's cross-owned companies that may have received them. That is a reporting gap, not a "newly discovered" subsidy.

Nor does *Bethlehem Steel* help the Government. Gov't Br. at 28. Deferral may be appropriate "when Commerce is faced with . . . extraordinarily complex subsidy allegations {and} may lack the resources or the time necessary to investigate the new allegations," *Bethlehem Steel*, 25 CIT at 313, but Neelson's affiliates presented no such complexity: Win-Tel disclosed Neelson Ceramic's cross-ownership early and repeatedly, and Commerce needed only to require the complete responses its questionnaire already demanded. Indeed, *Bethlehem Steel* held that Commerce's failure to investigate a subsidy allegation, despite having more than four months to do so, was legal error. *Id.* Here, as in *Bethlehem Steel,* deferral is merely a *post hoc* attempt to explain away Commerce's failure to investigate. *Id*. at 319.

The Government's appeal to Commerce's technical expertise is misplaced. Gov't Br. at 11–12. The Court exercises its "independent judgment" whether §351.311(c)(2)'s reference to "newly discovered practice{s}, subsid{ies}, {and} subsidy program{s}" reaches a reporting gap in programs already under investigation. *Lashify, Inc. v. Int'l Trade Comm'n*, 130 F.4th 948, 957 (Fed. Cir. 2025). That is a "pure question of law." *China Cornici Co. v. United States*, 799 F. Supp. 3d 1373, 1378–1379 (Ct. Int'l Trade 2025). Commerce knew that Neelson was Win-Tel's second-largest supplier, yet failed to investigate Neelson's cross-owned affiliates, including Neelson Ceramic, which exported to the U.S., and instead deferred that analysis to a subsequent administrative review. *See* CBP Entry Data (P.R. 309; C.R. 38–39); IDM at 37.

A deferral premised on a late discovery that the record contradicts is not "a reasonable policy to which the Court should give deference." *Olympia Indus., Inc. v. United States*, 22 CIT 387, 392 (1998). Commerce "neglected the opportunity to correct their problem," so the Court should remand. *Hebei Metals & Minerals Imp. & Exp. Corp. v. United States*, 366 F. Supp. 2d 1264, 1276 (Ct. Int'l Trade 2005).

#### 2. Section 1677m Is Not a Defense to Commerce's Failure to Investigate, but a Reason to Remand

The Government and Defendant-Intervenors argue that, "{i}nsofar as Neelson's full Section III response was deficient," Commerce "would have had to inform Win-Tel of the deficiency before resorting to facts available." Gov't Br. at 29; Def.-Intervenors Br. at 24–26. Yet the Government concedes that "Commerce did not notify Win-Tel of any such deficiency in any of Commerce's five supplemental questionnaires issued to Win-Tel." Gov't Br. at 29. That concession establishes Commerce's legal error, not a defense. Section 1677m(d) requires that Commerce "promptly inform the person submitting the response of the nature of the deficiency" and provide an opportunity to remedy it.

Just as it is inappropriate for Commerce to apply adverse facts available without first issuing a deficiency notice, "it is impermissible for Commerce to delay reporting that a respondent has provided insufficient information until after it is too late to correct." *Hitachi Energy USA Inc. v. United States*, 34 F.4th 1375, 1384 (Fed. Cir. 2022); *Hyundai Steel Co. v. United States*, 282 F. Supp. 3d 1332, 1349 (Ct. Int'l Trade 2018) (Commerce's failure to timely notify a party of a deficiency "is itself a violation of §1677m(d)"). Defendant-Intervenors' own authority confirms the point: *Baroque Timber* faulted Commerce for failing to "specifically point{} out and request{} clarification" of a deficiency. Def.-Intervenors Br. at 24 (citing *Baroque Timber Indus. (Zhongshan) Co. v. United States*, 776 F. Supp. 3d 1290, 1309 (Ct. Int'l Trade 2025)). Therefore,

Commerce's own failure to issue a deficiency notice cannot excuse its affirmative duty to investigate. *See Allegheny Ludlum*, 24 CIT at 461–462.

Commerce compounded the error by finding both that Win-Tel provided all requested information and that "Neelson should have submitted complete questionnaire responses." IDM at 37. Commerce cannot concede a gap while also finding that no one failed to provide requested information, unless the failure was Commerce's own in never requesting it. Therefore, the Court should remand for Commerce to obtain complete questionnaire responses for Neelson's cross-owned affiliates and recalculate Win-Tel's subsidy rate. Pl. Br. at 33.

### C. Commerce's Cross-Ownership and Attribution Analysis of Antiqa Affiliates Is Unsupported by Substantial Evidence and Not in Accordance with Law

As explained below, Commerce's cross-ownership and attribution determination for certain Antiqa affiliates cannot be sustained because it rests on an inconsistent application of the attribution regulations, the exclusion of reported subsidies, and an inadequate examination of the Antiqa Kundariya family's ownership and control of certain affiliated companies.

#### 1. Commerce's Narrow Construction of the Attribution Regulations Improperly Excluded Shivam's Subsidies from the Antiqa Entity's Rate

Commerce's exclusion of Shivam's subsidies is unsupported by substantial evidence and rests on an unduly narrow construction of the attribution regulations that disregards the record evidence of common ownership, merged interests, and Shivam's role in exporting the Antiqa entity's merchandise.

Shivam is [ ] owned by the Antiqa Kundariya family, which also controls Antiqa, and exports ceramic tile produced by the Antiqa entity's cross-owned producers, [ ]. Antiqa's Affiliation Response at 2–3, 6–7 and Exhibits 1(c), 3 (P.R. 397; C.R. 64–65); Antiqa's First Supplemental Questionnaire Response at Exhibit 3 (P.R. 470; C.R. 178–179). Shivam also received subsidies from the GOI during the POI. Antiqa's Initial Questionnaire

Response at 15–16 ("Antiqa's IQR") (P.R. 457; C.R. 114). Commerce found that "Antiqa, AVL, ACPL, ANPL and Shivam share common ownership because members of one family hold substantial ownership interests and board of director positions in the five companies," and that these interests "indicate that the companies' interests have merged, as contemplated by the CVD Preamble." Preliminary Decision Memorandum ("PDM") at 13 (P.R. 636). Indeed, Antiqa submitted a complete CVD questionnaire response for Shivam pursuant to Commerce's instruction to provide responses for certain cross-owned affiliates. Antiqa's IQR at 15–16 (P.R. 457; C.R. 114). Defendant-Intervenors' characterization of that submission as made "out of an abundance of caution" does not diminish the record evidence. Def.-Intervenors Br. at 21.

Moreover, Commerce treated Antiqa and Shivam as a single entity in the companion antidumping investigation covering the same POI. *Ceramic Tile from India: Preliminary Negative Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 89 Fed. Reg. 95,182 (Dep't of Commerce Dec. 2, 2024), and accompanying Preliminary Decision Memorandum (unchanged in AD Final Determination). Given this evidence, the Government cannot reasonably maintain that the Coalition "points to no record evidence supporting an alternative basis for attributing subsidies." Gov't Br. at 17.

Nevertheless, Commerce excluded Shivam's subsidies solely because Shivam, as a trading company, "does not satisfy any of the attribution criteria in 19 C.F.R. §351.525(b)(6)(ii)-(v)." IDM at 32; *see also* PDM at 14. This reasoning improperly treats the enumerated criteria as exhaustive, contrary to Commerce's own explanation of how the attribution rules operate.

The CVD Preamble expressly describes these provisions as "general rules" that cannot "account for all possible permutations in advance" and recognizes that "there may be many scenarios where these attribution rules do not fit precisely the facts of a particular case." *See*

*Countervailing Duties*, 63 Fed. Reg. 65,348, 65,399–400 (Dep't of Commerce Nov. 25, 1998) (final rule) ("CVD Preamble"). Commerce further emphasized that it is "extremely sensitive to potential circumvention of the countervailing duty law" and that "the facts of each case must be carefully examined." *Id.* at 65,400.

The Government concedes that the attribution criteria are not exhaustive. Gov't Br. at 17. Yet Commerce excluded Shivam's subsidies based solely on its failure to satisfy those criteria, despite the statute's express requirement to countervail subsidies provided "with respect to the manufacture, production, or *export*" of subject merchandise. 19 U.S.C. §1671(a) (emphasis added). Commerce's narrow construction thus permits a respondent to avoid countervailing duties on subsidies received by a commonly owned exporter of its own producers' merchandise, precisely the type of circumvention Commerce pledged to prevent.

### 2. The Government's Claim That Cross-Ownership Is "Immaterial" Rests on a Misstatement of the IDM and Is Contrary to Commerce's Own Analysis

The Government argues that, because Antiqa is a trading company rather than a producer, the "only basis" for attributing subsidies to Antiqa is 19 C.F.R. §351.525(c), rendering cross-ownership "ultimately, immaterial." Gov't Br. at 15–16, 21–22. But the regulations do not operate in isolation. Section 351.525(c) requires Commerce to cumulate subsidies received by an exporting trading company with those received by the producers whose merchandise it exports, while §351.525(b)(6) governs attribution of subsidies among cross-owned companies. Both provisions may apply in calculating a respondent's subsidy rate, as the CVD Preamble expressly recognizes. CVD Preamble, 63 Fed. Reg. at 65,404. The Government's position incorrectly treats the trading company rule as displacing the cross-ownership provisions, contrary to both the regulatory framework and Commerce's own analysis.

The Government also misstates Commerce's findings. It asserts that Commerce found Antiqa, AVL, ACPL, and ANPL cross-owned under §351.525(b)(6)(vi). Gov't Br. at 15 (citing PDM at 13). But Commerce expressly disclaimed that finding in the IDM, explaining that it "did not perform a cross-ownership analysis between Antiqa and any other company" and cumulated AVL's and ACPL's subsidies with Antiqa's "not because we found Antiqa, AVL and ACPL cross-owned, but because AVL and ACPL exported ceramic tile to the United States through Antiqa as a trading company." IDM at 17–18.

That distinction, however, does not render cross-ownership immaterial. Although Commerce relied on §351.525(c) to cumulate the producers' subsidies with Antiqa's, it separately examined whether nine other companies were cross-owned with those producers. IDM at 15, 18. Indeed, Commerce evaluated whether the Antiqa Kundariya family could use the assets of Antique Marbonite P. Ltd. ("Marbonite")—a ceramic tile producer in which the family holds a 50 percent interest through the Antique Granito Shareholders Trust, and which did not export through Antiqa—"in the same way that it can use AVL, ACPL or ANPL's . . . assets." *Id.* at 22. Commerce therefore applied the cross-ownership framework as part of the same attribution analysis that resulted in Antiqa's subsidy rate.

The Government's description of ANPL's treatment confirms the point. It acknowledges that Commerce attributed ANPL's subsidies to AVL under §351.525(b)(6)(ii) and (iii), governing cross-owned producers of the same product and holding or parent companies, respectively. Gov't Br. at 15. Both provisions require cross-ownership. Thus, Commerce applied the trading company and cross-ownership rules in calculating Antiqa's rate, directly contradicting the Government's assertion that cross-ownership was immaterial.

### 3. Commerce's Contradictory Cross-Ownership Findings Leave No Reasonably Discernible Basis for Its Determination

Commerce's contradictory findings concerning Shivam's cross-ownership leave no reasonably discernible basis for its refusal to attribute Shivam's subsidies. The Government argues that the Coalition "misstates Commerce's findings" because Commerce found that Antiqa and Shivam share common ownership and that their interests "have merged," but declined attribution on grounds unrelated to cross-ownership. Gov't Br. at 16–17 (citing PDM at 13). Yet the IDM expressly calls it "erroneous" to suggest Commerce found Shivam cross-owned, stating that "Commerce did not find Shivam Enterprise cross-owned with Antiqa in the Preliminary Determination." IDM at 30. Elsewhere, Commerce states that it "did not perform a cross-ownership analysis between Antiqa and any other company because affiliation with the trading company is not relevant or required under the regulation." IDM at 17.

These positions cannot all be correct. Either Commerce found Shivam cross-owned with the Antiqa entity but declined to attribute its subsidies, as the Government contends, or Commerce found no cross-ownership, as the IDM states at page 30, or Commerce conducted no cross-ownership analysis at all, as the IDM states at page 17. Moreover, the Government relies on the PDM's finding that the companies' interests "merged," which Commerce subsequently disavowed without explanation. PDM at 13; IDM at 30. These irreconcilable positions leave no "reasonably discernible" decisional path and warrant remand. *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369–70 (Fed. Cir. 1998).

### 4. The Government's and Defendant-Intervenors' Remaining Arguments Regarding Shivam Lack Merit

Neither the Government nor Defendant-Intervenors offers a persuasive basis for excluding Shivam's reported subsidies from the Antiqa entity's rate. The Government's attempt to distinguish *Refrigerators from Korea* only reinforces the point. *Bottom Mount Combination*

*Refrigerator-Freezers from the Republic of Korea: Final Affirmative Countervailing Duty Determination*, 77 Fed. Reg. 17,410 (Dep't of Commerce Mar. 26, 2012), and accompanying Issues and Decision Memorandum.

According to the Government, Commerce attributed the service provider's subsidies in that case because it "provide{d} services that benefit the production and/or sale of the subject merchandise." Gov't Br. at 18. Exporting subject merchandise produced by [ ] to the United States is a service that benefits the sale of subject merchandise produced by the Antiqa entity. The Government's response—that Shivam "did not provide any service to Antiqa"—improperly narrows the inquiry to Antiqa in isolation, when Commerce itself treats Antiqa, [ ] collectively as the "Antiqa Respondents." *See* PDM at 14. As Commerce explained in *Refrigerators from Korea*, if such companies' subsidies "are not attributable to related companies producing goods, such service providers could be subsidized with impunity by governments, allowing producers to benefit." Pl. Br. at 20. That is precisely the loophole Commerce's determination creates here.

Defendant-Intervenors' remaining arguments fail to justify Commerce's exclusion of Shivam's reported subsidies. Neither the scope of Commerce's investigation nor Shivam's status as a non-producer addresses its receipt of subsidies while exporting merchandise produced by Antiqa's cross-owned producers.

First, Defendant-Intervenors argue that *POSCO* is inapposite because Commerce "thoroughly investigated" Antiqa's affiliations. *POSCO v. United States*, 977 F.3d 1369, 1377 (Fed. Cir. 2020); Def.-Intervenors Br. at 14–17. But the Coalition challenges Commerce's failure to account for subsidies disclosed in Shivam's and Luxgres' questionnaire responses. Antiqa's IQR at 15–16 (P.R. 457; C.R. 114); Luxgres IQR at 7–8 (P.R. 486; C.R. 237). Commerce's

"affirmative duty to investigate any appearance of subsidies" is not discharged merely by collecting information it subsequently disregards. *POSCO*, 977 F.3d at 1378.

Second, Defendant-Intervenors mischaracterize the Coalition's claim as speculation that Shivam "may be engaged in ceramic tile production." Def.-Intervenors Br. at 21. Attribution does not depend on Shivam producing ceramic tile. Shivam is [ ] owned by the Antiqa Kundariya family, exported subject merchandise produced by Antiqa's cross-owned producers, and reported receiving subsidies during the POI. Pl. Br. at 17–21. Defendant-Intervenors' discussion of Shivam Surface and Shivam Abrasive is therefore beside the point. Def.-Intervenors Br. at 21.

Commerce's failure to account for Shivam's reported subsidies, and consequently those of Luxgres, warrants remand for reconsideration under 19 C.F.R. §351.525(c).

### 5. Substantial Evidence Does Not Support Commerce's Determination That Marbonite Is Not Cross-Owned with the Antiqa Entity

As described below, Commerce's determination that Marbonite is not cross-owned with the Antiqa entity is unsupported by substantial evidence. Commerce failed to meaningfully evaluate the Antiqa Kundariya family's ownership and managerial control, explain how Marbonite's supply agreement with Prism Johnson negated that control, or reconcile its conclusion with a prior cross-ownership determination involving substantially similar ownership arrangements. Defendants' *post hoc* rationalizations cannot cure these deficiencies. *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003).

#### a. Commerce Failed to Adequately Consider the Antiqa Kundariya Family's Ownership and Managerial Control of Marbonite

Commerce failed to adequately consider evidence that the Antiqa Kundariya family could use or direct Marbonite's assets through its 50 percent ownership interest and substantial managerial authority. Although the Government argues that ownership alone does not establish

cross-ownership, the Coalition does not contend otherwise. Gov't Br. at 23. The CVD Preamble recognizes that even a 40 percent minority voting interest may establish cross-ownership. 63 Fed. Reg. at 65,401. Commerce was therefore required to evaluate the family's ownership alongside its governance rights.

Under the joint venture shareholder agreement, the family, through the Antique Granito Shareholders Trust ("Antique Trust"), appoints [ ]. Antiqa's Affiliation Response at 16 (P.R. 397; C.R. 64). Defendant-Intervenors acknowledge that Antique Trust appoints the [ ] and that Prism Johnson's appointed chairman is [ ]. Def.-Intervenors Br. at 23. These rights directly bear on the family's ability to direct Marbonite's assets, yet Commerce never explained why they were insufficient to establish cross-ownership. Nor did Commerce reconcile its finding that "the record supports finding Marbonite and Antiqa affiliated through familial relationships" with the evidence of common ownership and managerial control. IDM at 23. Instead, Commerce focused on the absence of common ownership or management between the family and Prism Johnson, a separate inquiry that does not resolve whether the family can direct Marbonite's assets. *Id.* at 21, 23–24.

The Government's exhaustion argument is equally unavailing. Gov't Br. at 25 n.5. The Coalition challenged Commerce's cross-ownership determination before the agency, and Commerce expressly addressed that issue. Gov't Br. at 8; IDM at Cmt. 2B. Marbonite's board composition is record evidence supporting that challenge, not a separate unexhausted claim. Indeed, Defendant-Intervenors themselves rely on Marbonite's governance structure to defend Commerce's determination. Def.-Intervenors Br. at 23.

Commerce's failure to meaningfully evaluate the family's ownership and managerial authority leaves its cross-ownership determination unsupported by substantial evidence.

### b. The Supply Agreement Does Not Negate the Antiqa Kundariya Family's Control Over Marbonite, and Defendants' *Post Hoc* Rationalizations Cannot Cure Commerce's Deficient Analysis

The Government and Defendant-Intervenors cannot defend Commerce's cross-ownership determination by attributing findings to Commerce that it never made or supplying *post hoc* reasoning absent from the IDM. Rather than examining whether Marbonite's supply agreement with Prism Johnson limits the Antiqa Kundariya family's ability to use or direct Marbonite's assets, Commerce merely accepted Antiqa's representations without explaining how they satisfied the regulatory standard for cross-ownership. Under that standard, cross-ownership exists when one corporation can "use or direct the individual assets" of another in essentially the same manner as its own. 19 C.F.R. §351.525(b)(6)(vi).

Specifically, Commerce recited Antiqa's statements that Prism Johnson controlled Marbonite's production and sales and that Marbonite required written permission to sell merchandise independently. IDM at 21–22. Commerce then concluded, without further explanation, that the family could not use or direct Marbonite's assets in the same manner as AVL's, ACPL's, or ANPL's assets. *Id.* at 22. Yet the agreement's express terms and scope establish that it is not an exclusive supply agreement at all. Antiqa's Affiliation Response at Exhibit 3(b) (P.R. 398; C.R. 65). The agreement does not require Marbonite to irrevocably dedicate all of its production to Prism Johnson. *Id.* Indeed, Defendant-Intervenors acknowledge that the agreement is a bilateral commercial arrangement. Def.-Intervenors Br. at 23. Treating such an agreement as dispositive would effectively allow a producer to defeat cross-ownership through a sales arrangement, regardless of common ownership or managerial control.

The Government attempts to supply Commerce's missing reasoning by arguing that Prism Johnson's contractual rights limit the family's control and prevent a merging of corporate interests. Gov't Br. at 22–23. Commerce made no such finding. Nor did Commerce find that the family lacked ownership or management interests in Prism Johnson, as the Government suggests. Rather, Commerce merely recited Antiqa's representation and separately examined Prism Johnson's cross-ownership. IDM at 21, 23–24. The Government's emphasis on whether Marbonite required written "permission" rather than written "notice" is likewise misplaced. Gov't Br. at 22–23. Under either interpretation, the agreement contemplates independent sales by Marbonite, and neither requirement establishes that the family lacks authority over its assets. Antiqa's Verification Report at 5 (P.R. 692; C.R. 539).

More importantly, the agreement itself provides affirmative evidence of the family's control. Every page [ ], a member of the Antiqa Kundariya family and shareholder in the Antiqa entity, who executed the agreement [ ]. Antiqa's Affiliation Response at 13–16, Exs. 3, 3(b) (P.R. 397; C.R. 64). Defendant-Intervenors dismiss his execution as ordinary corporate authorization. Def.-Intervenors Br. at 23. Yet [ ] Marbonite to an agreement governing its production and sales is evidence of the family's ability to direct Marbonite's operations.

Commerce never reconciled that evidence with its conclusion that the family could not use or direct Marbonite's assets. Defendants' *post hoc* rationalizations cannot cure Commerce's failure to apply the regulatory standard to the record evidence of the family's ownership and managerial control.

**c. Commerce Failed to Adequately Explain Its Departure from Its Prior Cross-Ownership Determination**

The Government and Defendant-Intervenors mischaracterize the Coalition's reliance on *QSP from India* as an attempt to introduce evidence from another proceeding. Gov't Br. at 24; Def.-Intervenors Br. at 12–14; *Certain Quartz Surface Products from India: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances, In Part*, 85 Fed. Reg. 25,398 (Dep't of Commerce May 1, 2020), and accompanying Issues and Decision Memorandum. In *QSP from India*, Commerce found Marbonite, a 50-50 joint venture between Antique Trust and Prism Johnson, was cross-owned with Prism Johnson, Shivam, and Antique Trust. Pl. Br. at 22–23. The present record independently establishes the Antiqa Kundariya family's 50 percent ownership of Marbonite through Antique Trust. Antiqa's Affiliation Response at 13–18 (P.R. 397; C.R. 64). The Coalition thus relies on Commerce's prior determination to demonstrate inconsistent application of the cross-ownership standard, not to supplement the record.

Although the Government acknowledges that prior determinations may have persuasive value, Commerce dismissed *QSP from India* as "unavailing and inappropriate" without meaningfully addressing its relevance. Gov't Br. at 24; IDM at 20. That dismissal is particularly difficult to reconcile with Commerce's reliance on the same proceeding elsewhere in the IDM. IDM at 49–50 & n.211. Commerce's failure to explain its different treatment of substantially similar ownership arrangements warrants remand. *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001).

**D. Defendant-Intervenors' Failure-to-Exhaust Arguments Lack Merit Because Commerce Considered and Decided the Issues Presented**

The Coalition does not dispute that parties ordinarily must raise issues before Commerce to preserve them for judicial review. *See* 28 U.S.C. §2637(d). Defendant-Intervenors nevertheless

argue that the Coalition failed to exhaust its challenges to Commerce's treatment of Shivam and Marbonite because those issues arose in the context of AFA. Def.-Intervenors Br. at 18–22. The Government, however, acknowledges that the Coalition challenged Marbonite's cross-ownership and Shivam's exclusion from the attribution analysis. Gov't Br. at 8, 16–25 & n.5. More importantly, Commerce considered and decided both issues, satisfying exhaustion's purposes of protecting agency authority and promoting judicial efficiency. *See Sandvik Steel Co. v. United States*, 164 F.3d 596, 600 (Fed. Cir. 1998); *Nucor Corp. v. United States*, 600 F. Supp. 3d 1225, 1240 n.20 (Ct. Int'l Trade 2022). Commerce expressly addressed Marbonite's cross-ownership and Shivam's exclusion from attribution and examined Marbonite's relationship with Antiqa at verification following the Coalition's comments. IDM at 17, 20–22, 30–33; Antiqa's Verification Report at 5 (P.R. 692; C.R. 539). Commerce therefore had opportunity to address the issues presented for judicial review.

Defendant-Intervenors' attempt to distinguish the Coalition's AFA arguments from its attribution challenges is equally unpersuasive because those arguments rested on the Coalition's position that Commerce improperly excluded subsidies received by cross-owned affiliates. Indeed, the Coalition expressly requested that Commerce "consider attributed subsidies to all cross-owned affiliates within the Antiqa Group." Petitioner's Case Brief at 56 (P.R. 704; C.R. 543). Seeking narrower relief before this Court does not render those arguments unexhausted. Nor does Defendant-Intervenors' characterization of the Coalition's understanding of Shivam's preliminary cross-ownership finding establish a failure to exhaust, particularly when the Government itself describes that finding inconsistently with the IDM. Gov't Br. at 16–17; IDM at 30.

Defendant-Intervenors' narrower objections likewise fail. Commerce acknowledged the Coalition's argument that Marbonite's supply agreement "dates to May 5, 2005" and does not break "any affiliation or cross-ownership." IDM at 23. The Coalition's reliance on that agreement and Commerce's verification findings therefore raise no new issue. Similarly, Marbonite's board composition is record evidence supporting the cross-ownership challenge Commerce decided, not a separate unexhausted claim. Gov't Br. at 25 n.5; IDM at 20–22.

Finally, the Coalition's Luxgres argument follows directly from its challenge to Shivam's exclusion. The Government acknowledges that Luxgres' treatment depends on whether Shivam's subsidies may be cumulated with Antiqa's, and Commerce addressed the companies together. Gov't Br. at 20; PDM at 14. If Shivam's exclusion was unlawful, Commerce must reconsider the treatment of Luxgres' reported subsidies under 19 C.F.R. §351.525(c). Luxgres IQR at 7–8 (P.R. 486; C.R. 237). Accordingly, Defendant-Intervenors' exhaustion objections provide no basis to deny review or remand.

**E. Commerce's Decision to Not Initiate on the Minerals for LTAR Upstream Allegation Was Unlawful and Unsupported by Substantial Evidence**

Lastly, Commerce erred in declining to investigate the Coalition's upstream subsidy allegation concerning the provision of minerals for LTAR. The Government defends Commerce's determination on grounds the allegation concerned a direct subsidy to the mandatory respondents rather than their upstream suppliers. Gov't Br. at 43–46; Def.-Intervenors Br. at 34–35; IDM at 81. That characterization misreads the allegation and imposes a burden beyond the regulatory requirements for initiation.

An upstream subsidy is provided "with respect to" an input product used to produce subject merchandise, with the benefit passed through to the producer. 19 U.S.C. §1677-1(a); 19 C.F.R. §351.523(a)(1). The Coalition alleged that the state-owned [

] "supplies raw materials such as silica sand and ball clay to downstream industries, including input suppliers of ceramic tile producers," which receive the minerals for LTAR and pass the subsidy benefit through to the mandatory respondents by supplying inputs at reduced prices. *See* Commerce's New Subsidy Allegations of Upstream Subsidies at 3 (P.R. 691; C.R. 538); IDM at 78–79. Commerce nevertheless characterized the allegation as a direct subsidy to the respondents, disregarding the alleged benefit to their upstream suppliers. IDM at 81.

The Coalition satisfied the regulatory threshold for initiation. Section 351.523(a)(1) requires a reasonable basis to believe or suspect that a countervailable subsidy is provided with respect to an input product and that government pricing ensures the benefit passes through to producers of subject merchandise. 19 C.F.R. §§351.523(a)(1)(i), (ii)(C). The Coalition identified [ ] provision of minerals for LTAR and explained how the benefit reached ceramic tile producers through their input suppliers. Although the Coalition lacked complete information identifying the respondents' actual suppliers, it relied on reasonably available evidence, including respondents' financial statements identifying potential suppliers, and submitted supplemental information concerning key mineral inputs. Win-Tel, Theos, Neelson 2023-24 Financial Statements (P.R. 622; C.R. 403–405); Antiqa Financial Statements (P.R. 631; C.R. 412–430); Coalition's Upstream Allegations (P.R. 660; C.R. 449–454); Upstream Supplemental Response (P.R. 682–686; C.R. 531–537).

Congress requires Commerce to investigate whenever it has "reasonable grounds to believe or suspect" that an upstream subsidy is being bestowed. 19 U.S.C. §1671(e). This threshold is low because an allegation serves to alert Commerce to a potential subsidy, not conclusively establish its existence. *RZBC Grp. Shareholding Co. v. United States*, 100 F. Supp. 3d 1288, 1292, 1295 (Ct. Int'l Trade 2015); *Nucor*, 600 F. Supp. 3d at 1234. Commerce has an affirmative duty

to investigate appearances of subsidies discovered during an investigation. *POSCO*, 977 F.3d at 1378.

Commerce improperly rejected the allegation as an untimely direct subsidy allegation without applying the statutory and regulatory initiation standards, contrary to Congress's intent to expand Commerce's authority to investigate upstream subsidies regardless of cross-ownership. IDM at 81; H.R. Rep. No. 98-725 (1984). Remand is warranted.

## III. CONCLUSION

For these reasons, we respectfully request that the Court grant Plaintiff's motion for judgment on the agency record and remand this matter to Commerce for disposition consistent with the opinion and order of the Court and order any additional relief the Court may deem just and proper.

Respectfully submitted,

David M. Spooner, Esq.
Christine J. Sohar Henter, Esq.
BARNES & THORNBURG LLP
555 12th St. NW, Suite 1200
Washington, D.C. 20004
(202) 371-6377

*Counsel to Plaintiff*
*Coalition for Fair Trade in Ceramic Tile*

Date: October 29, 2026

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief contains 6,984 words (including text, quotations, footnotes, headings, and attachments) and therefore complies with the word limitation set forth in this Court's Scheduling Order and the Standard Chambers Procedures. In preparing this certificate of compliance, I have relied on the word count function of the word processing system used to prepare the brief.

Date: October 29, 2026

/s/ David M. Spooner
David M. Spooner

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE JOSEPH A. LAROSKI, JR., JUDGE**

| | |
|---|---|
| COALITION FOR FAIR TRADE IN CERAMIC TILE,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>WIN-TEL CERAMICS PRIVATE LTD., ANTIQA MINERALS, and M.S. INTERNATIONAL, INC.,<br><br>Defendant-Intervenors. | Court No. 1:25-cv-00152-JAL |

**ORDER**

Upon consideration of the motion for judgment on the agency record filed by plaintiff, Coalition for Fair Trade in Ceramic Tile (the "Plaintiff"), the responses thereto filed by Defendant and Defendant-Intervenors, the Plaintiff's reply, the administrative record, all other papers and proceedings herein, and upon due deliberation, it is hereby

**ORDERED** that the Plaintiff's motion for summary judgment on the agency record is **GRANTED**; it is further

**ORDERED** that the U.S. Department of Commerce's final determination in the countervailing duty investigation of ceramic tile from India is remanded for disposition consistent with this Court's opinion and order; and it is further

**ORDERED** that Commerce shall file its remand redetermination within ninety (90) days of this date; and it is further

**ORDERED** that Commerce shall file the administrative record for the remand proceeding within fourteen (14) days of the date of the filing of its remand redetermination; and it is further

**ORDERED** that the parties shall have thirty (30) days to file comments on the remand redetermination; and it is further

**ORDERED** that the parties shall have thirty (30) days to file replies to the comments on the remand redetermination; and it is further

**ORDERED** that the parties shall file the joint appendix within fourteen (14) days after the deadline to file replies to the comments on the remand redetermination.

**SO ORDERED.**

Date: ____________________
New York, New York

____________________________________
Honorable Joseph A. Laroski, Jr., Judge
U.S. Court of International Trade